[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11802

_____

D.C. Docket No. 3:15-cv-00078-TCB


JERBEREE JEFFERSON,

                                                      Plaintiff - Appellant,

versus

SEWON AMERICA, INC.,

                                                      Defendant - Appellee.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 1, 2018)

Before WILLIAM PRYOR and JULIE CARNES, Circuit Judges, and
CORRIGAN,[*] District Judge.

WILLIAM PRYOR, Circuit Judge:

_____

[*] Honorable Timothy J. Corrigan, United States District Judge for the Middle District of Florida,
sitting by designation.

This appeal presents the question whether the district court erred when it granted summary judgment in favor of Sewon America, Inc., and against Jerberee Jefferson's complaint of employment discrimination on the basis of race and national origin and of retaliatory termination, 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981. Jefferson, an African American, worked for Sewon as a clerk in its finance department. While Jefferson was still in her probationary period of employment, she approached a manager in the information technology department, Gene Chung, and expressed interest in transferring to his department. Chung told Jefferson that he supported the transfer and that Jefferson could soon switch departments. But he later informed her that she was ineligible for the transfer because she lacked experience and because a higher-ranked manager "wanted a Korean in that position." Jefferson immediately reported this statement to the human resources department, and a week later, Sewon fired Jefferson. Jefferson then sued, and the district court granted summary judgment in favor of Sewon. We reverse in part because Jefferson presented direct evidence that Sewon failed to transfer her on the basis of her race and nationality and circumstantial evidence that Sewon fired her in retaliation for her complaint, and we affirm in part because Jefferson failed to present substantial evidence that Sewon fired her on the basis of race or national origin. And we remand for further proceedings.

2

## I.    BACKGROUND

We divide the background in two parts. First, we describe the facts by viewing the evidence, as we must, in the light most favorable to Jefferson. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1291–92 (11th Cir. 2012). Second, we describe the proceedings in the district court.

### A.    *The Facts*

In March 2013, Sewon hired Jefferson as a temporary clerk in its finance department. In June 2013, Sewon promoted Jefferson to full-time, but probationary, status in the same position. The next month, Jefferson learned of an open position in the information technology department.

Jefferson had been taking technology classes at a local college and had the "career goal" of working in information technology. She approached the department manager, Gene Chung, who told her that "he wanted [her] to transition to the department." Chung interviewed Jefferson and told her that "he was willing to transition [her] over" to the information technology department and that he liked her "work ethic[.]" He also encouraged her to continue her coursework and told her that "he would train [her in] anything [that she] didn't know [from school] if it was related to the job." Chung explained that "the next steps" were for Jefferson to "take a test" and for Nate Jung, a high-level manager, to approve the transition, and Chung told Jefferson that she "would be transferred over to the [information

3

technology] department by the end of the week." After meeting with Chung, Jefferson also spoke to Ken Horton, Sewon's human resources manager, who told her that "he would talk to [Chung] and work something out" so that Jefferson could switch departments.

In August, Chung gave Jefferson a "basic knowledge" test about computers. Jefferson admitted that she "didn't do so [well] on [the test]," and Chung averred that she "performed so poorly on [the] test that [he] had no interest in employing her in the [information technology] [d]epartment." But Chung told her that the job was not "dependent on" the test and, after Jefferson finished the test, Chung went "over the results with [her]," told her "to take it home, research it, [and] correct [her] wrong answers," and later reviewed her new research and responses. Jefferson testified that it remained her "understanding that [Chung] still was going to talk to . . . Jung about [the transfer]."

Around the same time, Jefferson had some difficulty with her managers in the finance department: Esther Kim and Jenny Hong. Kim was Jefferson's immediate supervisor and Kim reported to Hong. Both supervisors told Jefferson that "they wished [that Jefferson] had come to them first [about the transfer] as opposed to going to . . . Chung." But Jefferson explained that the managers "didn't seem mad" and that there was "mutual[] agreement" that she could transfer. Jefferson also had irritated the managers by "coming back [late] from lunch several

4

times" and failing to silence her phone at work. Despite these issues, on August 16, the managers decided to "figure out a way to make [Jefferson] continue working for the company in a more productive way."

Soon afterward, Jefferson's employment took a turn for the worse. On August 20, Hong completed a negative performance evaluation that awarded Jefferson a total of 64 out of 200 possible points. Notwithstanding Hong's earlier assurance to Jefferson that she would not stand in the way of a transfer, even though Jefferson had not first asked her permission, the evaluation underscored that Jefferson "disregard[ed] policies and procedures" that required her to report to "her direct supervisor" and that Jefferson did not "want to work with her direct supervisor."

On August 23, Chung met with Jefferson and told her, for the first time, that she could not transfer to the information technology department. He explained that the open position required "five years of experience" and that "Jung said that he wanted a Korean in that position." Jefferson immediately complained about this alleged racial discrimination to Horton, the human resources manager. Horton told her not to "take it personal[ly]" and to "brush it off."

On the same day that Jefferson complained about racial discrimination underlying the denial of her request to transfer, Kim filled out a performance evaluation that gave Jefferson a score of 68 out of 200. The evaluation underscored

5

that Jefferson "disregard[ed] policies and procedures and d[id] not inform her direct supervisor [of problems]," and it concluded that "there [was] no room for improvement." Despite these deficiencies, the review also stated that Jefferson "c[a]me to work on time every day" and "work[ed] well and complete[d] her tasks in a timely manner." Kim testified that she had never "filled out this type of [evaluation] for anyone else" or "reprimanded anyone else for" the same kinds of issues cited in her evaluation of Jefferson.

Horton collected Hong's and Kim's evaluations, averaged the scores, and "applied a pre-established minimum threshold number." Jefferson received a score of 32.5, "below the pre-established threshold [for termination] of 35." Horton averred that this method "was used for other introductory employee evaluations in the past and was not a threshold applied only to . . . Jefferson's average score" and that he "never advised . . . Kim or . . . Hong of this pre-established score before they completed [the] evaluations."

One week later, on August 30, Sewon fired Jefferson. Jefferson received no written warning or final warning before her dismissal, despite a "progressive discipline policy" that uses a system of "verbal warnings, . . . [a] written warning," and a "final warning" before an employee is terminated. At a later deposition, Horton testified that "it [was] important to follow that [particular discipline] policy at [Sewon]," but that the company might depart from the policy in cases of sexual

6

harassment, violence, illegal conduct, or other egregious misconduct. James Dye, a human resources specialist, met with Jefferson after she was fired. He told her that "[she] didn't pass [her evaluations]" but that "[h]e didn't know [why]" she had failed. Dye later represented Sewon in state-level unemployment proceedings regarding Jefferson's termination.

## B.      The Proceedings in the District Court

Jefferson filed a complaint that Sewon discriminated against her on the basis of race and national origin when it refused to transfer and later fired her and that Sewon fired her in retaliation for her complaint to Horton, 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981. During discovery, Jefferson submitted an affidavit from Dye, the human resources specialist. One paragraph of the affidavit stated that "Jefferson was terminated because of her complaint of discrimination." But Dye's affidavit failed to describe a basis for any personal knowledge of this fact. Indeed, other portions of the affidavit took the contrary position that "Jefferson was terminated after failing to score high enough on her 60-day evaluation" and stated that Dye specifically recalled that Jefferson fell "just short of the minimum requirement." Dye's affidavit also asserted that Sewon subjected "American employees" to stricter discipline than "Korean employees," but it again failed to offer specific examples of this disparity or to explain how Dye formed this knowledge.

7

Sewon moved for summary judgment and objected to the paragraph of Dye's declaration that alleged retaliation. A magistrate judge issued a report and recommendation that granted the objection to this paragraph on the ground that a declaration must be based on "a witness's personal knowledge" and that "no portion of the declaration establishe[d] the foundation for Dye's opinion." The magistrate judge then recommended granting summary judgment in favor of Sewon.

The district court agreed with the magistrate judge's recommendation and granted summary judgment in favor of Sewon. With respect to Jefferson's claim that Sewon refused to transfer her for discriminatory reasons, the district court reasoned that Jefferson failed to establish a prima facie case of discrimination because she did not suffer an "adverse employment action" when Sewon refused to transfer her to the information technology department. In the alternative, the district court ruled that Jefferson failed to establish that the job qualifications for the information-technology position cited by Sewon were pretextual. With respect to Jefferson's claim that Sewon fired her for discriminatory reasons, the district court concluded that the termination was not discriminatory "under a holistic view of the evidence." Finally, it determined that Jefferson could not establish that Sewon fired her in retaliation for her complaint: it approved the exclusion of Dye's allegation, ruled that Jefferson's complaint was not "protected conduct," and ruled

8

that Jefferson failed to establish that retaliation was the but-for cause of her termination because she "failed to rebut Sewon's proffered reasons for her termination."

## II.    STANDARDS OF REVIEW

"We review an entry of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in favor of the nonmoving party." *Jones*, 683 F.3d at 1291–92 (italics added). We examine claims of discrimination and retaliation under the same legal framework regardless of whether the plaintiff invokes section 1981 or section 2000e. *See Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256–57 (11th Cir. 2012) (discrimination); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (retaliation). And we review evidentiary rulings for abuse of discretion. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016).

## III.    DISCUSSION

We divide our discussion in four parts. First, we reject Jefferson's argument that the Seventh Amendment to the Constitution bars a district court from granting summary judgment against a claim of employment discrimination. Second, we explain that the district court erred when it granted summary judgment against Jefferson's claim that Sewon refused to transfer her for discriminatory reasons. Third, we explain that the district court erred when it granted summary judgment

9

against Jefferson's claim of retaliatory termination. Fourth, we explain that the district court committed no error when it granted summary judgment against Jefferson's claim of discriminatory termination.

### A.    *Summary Judgment Is Constitutional.*

Jefferson contends that "summary judgment, as applied to discrimination cases, violates the Seventh Amendment," and an *amicus curiae*, Professor Suja Thomas, advances the radical argument that summary judgment is always unconstitutional. Nonsense. The Supreme Court made clear long ago that "summary judgment does not violate the Seventh Amendment." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336 (1979) (citing *Fid. & Deposit Co. v. United States*, 187 U.S. 315, 319–21 (1902)). And we have held that "[i]t is beyond question that a district court may grant summary judgment where the material facts concerning a claim cannot reasonably be disputed." *Garvie v. City of Fort Walton Beach*, 366 F.3d 1186, 1190 (11th Cir. 2004). "Even though [a grant of summary judgment] prevents the parties from having a jury rule upon [the] facts," a jury trial is unnecessary "when the pertinent facts are obvious and indisputable from the record[] [and] the only remaining truly debatable matters are legal questions that a court is competent to address." *Id.*; *see also Oglesby v. Terminal Transp. Co.*, 543 F.2d 1111, 1112–13 (5th Cir. 1976).

Federal Rule of Civil Procedure 56, which governs summary judgment, applies with equal force to claims of employment discrimination. We have repeatedly rejected arguments that "summary judgment is especially questionable and should seldom be used in employment discrimination cases because they involve examination of motivation and intent," *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (alteration adopted) (citation and internal quotation marks omitted), and we have explained "that the summary judgment rule applies in job discrimination cases just as in other cases," *Chapman v. AI Transport*, 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc). To be sure, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of [a disputed] matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). But when the "facts are obvious and indisputable," *Garvie*, 366 F.3d at 1190, or when the district court considers disputed facts in the light most favorable to the nonmoving party, the district court does not intrude on the constitutional role of the jury when it considers whether a complaint fails as a matter of law. Settled precedent forecloses any argument to the contrary.

B.    *The District Court Erred when It Granted Summary Judgment Against Jefferson's Claim of Disparate Treatment that Sewon Refused To Transfer Her.*

Section 2000e-2(a)(1) establishes that "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his

11

compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). This provision forbids "disparate treatment" of, or "intentional discrimination" against, employees on the basis of race or national origin. *Equal Emp't Opportunity Comm'n v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015) (internal quotation marks omitted). To "support a claim [of discrimination]," an employee must show "a tangible adverse effect" on her employment. *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001). She also must establish discriminatory intent "through either direct evidence or circumstantial evidence." *Wilson*, 376 F.3d at 1085.

The district court erred in two ways in its evaluation of Jefferson's claim about her transfer. The district court ruled that Jefferson failed to establish that she suffered an adverse employment action and that she failed to present substantial evidence that Sewon declined to transfer her for discriminatory reasons. We disagree with both rulings.

### 1.    Jefferson Suffered an Adverse Employment Action.

An employee must establish an "adverse employment action" by proving that a decision of the employer "impact[ed] the terms, conditions, or privileges of [her] job in a real and demonstrable way." *Davis*, 245 F.3d at 1239 (internal quotation marks omitted). This "impact cannot be speculative and must at least

12

have a tangible adverse effect on the plaintiff's employment." *Id.* The "employee must show a *serious and material* change in the terms, conditions, or privileges of employment" so that a "reasonable person in the circumstances" would find "the employment action [to] be materially adverse." *Id.*; *see also Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1203 (11th Cir. 2013) (explaining that the "loss of supervisory responsibilities" is not a material change absent a showing of "significantly different responsibilities" (citation and internal quotation marks omitted)). In short, when an employee alleges that she was denied a different job within the same organization, she must establish that "a reasonable person faced with a choice [between the positions] . . . would prefer being transferred to [the new] position." *Webb-Edwards v. Orange Cty. Sherriff's Office*, 525 F.3d 1013, 1032 (11th Cir. 2008). She may do so with evidence of improved "wages, benefits, or rank," as well as other "serious and material change[s] in the terms, conditions, and privileges of employment," *id.* at 1033, such as the "prestige" of the position, *Hinson v. Clinch Cty., Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000).

The district court ruled that Jefferson failed to offer evidence that "the [new] position . . . would have entailed greater skill and provided more specialized experience, on-the-job education, and greater potential for career advancement," but we disagree. The position in the finance department had "significantly different responsibilities" from the position in the information technology department. *Kidd*,

13

731 F.3d at 1203 (citation and internal quotation marks omitted). For example, Jefferson explained that the new job included "responsibilities and duties" such as "setting up new hardware," "problem-solving with respect to software glitches," and "working with the network server." Indeed, that Chung administered a preliminary test and that Sewon later insisted that the job required five years of experience and that Jefferson was unqualified for the new work—even though she was qualified for her old job—suggests that the position in the information technology department had special responsibilities and carried additional "prestige." *Hinson*, 231 F.3d at 829.

Jefferson also articulated a strong basis for preferring a transfer. She explained that she was enrolled in "[information technology] classes" at the time, repeatedly expressed interest in this career path, and testified that Chung told her that "he would train [her in] anything [that she] didn't know [from school] if it was related to the job." This promise of education and experience in a specific skilled position is a material benefit. And, again, Jefferson must show only that "a reasonable person faced with a choice [between the positions] . . . would prefer being transferred to [the new] position." *Webb-Edwards*, 525 F.3d at 1032.

2.    Jefferson Offered Direct Evidence of Discriminatory Intent.

An employee who alleges discriminatory treatment also must show "through either direct evidence or circumstantial evidence" that her employer acted with

14

discriminatory intent. *Wilson*, 376 F.3d at 1085. "Direct evidence is 'evidence, that, if believed, proves [the] existence of [discriminatory intent] without inference or presumption.'" *Id.* at 1086 (first alteration in original) (quoting *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997)). In contrast, circumstantial evidence only "suggests, but does not prove, a discriminatory motive," *id.*, and may be evaluated under the burden-shifting test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "When a plaintiff proves a case of discrimination by direct evidence, application of *McDonnell Douglas* is inappropriate," *Equal Emp't Opportunity Comm'n v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990); *see also Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 961–62 (11th Cir. 1997), and the district court may not grant summary judgment "[w]here the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial . . ., even where the movant presents conflicting evidence," *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)).

Because Jefferson presented *direct* evidence of discrimination, the district court erred when it evaluated this evidence under the burden-shifting test for *circumstantial* evidence established in *McDonnell Douglas*. We have explained that "'only the most blatant remarks, whose intent could mean nothing other than

15

to discriminate on the basis of' some impermissible factor constitute direct evidence of discrimination." *Wilson*, 376 F.3d at 1086 (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir 2002)). Jefferson satisfied this standard when she testified that Chung, the manager of the information technology department, told her that "he could not offer [her] the job position" because Jung, a higher-ranked manager, "said that he wanted a Korean in that position." The district court never excluded this "blatant" evidence, *id.* (quoting *Rojas*, 285 F.3d at 1342 n.2), or made any other ruling that undercut its admissibility. Indeed, the magistrate judge specifically acknowledged this statement in the report and recommendation. Although Sewon denies this assertion, we must credit Jefferson's sworn testimony. *See* Fed. R. Civ. P. 56(c)(1)(A) (explaining that a party may establish a genuine dispute "by . . . citing to particular parts of materials in the record, *including depositions*" (emphasis added)).

To be sure, at least some of the blame for this error lies with Jefferson because she repeatedly described her evidence as circumstantial, not as direct evidence of discrimination. For example, her response in opposition to summary judgment presented her allegation of discrimination using the test for circumstantial established in *McDonnell Douglas*, even though she asserted in the same filing that a plaintiff can establish a separate claim for *retaliation* "through either *direct evidence* or circumstantial evidence." Only in her objection to the

16

report and recommendation did she dispute the "fixed formula or framework" of *McDonnell Douglas*. But, even then, she presented her facts as "a convincing mosaic of *circumstantial* evidence" and insisted that the district court should not distinguish between "direct or indirect" evidence. On appeal, she advanced a similar theory about circumstantial evidence. For example, she explained that "evidence should [not] be treated differently from other evidence because it can be labeled direct or indirect" and that this Court should weigh "the totality of the evidence" as "*circumstantial* evidence that creates a triable issue concerning the discriminatory intent."

Despite Jefferson's failure to appreciate the difference between direct and circumstantial evidence, we must reverse this legal error. Although we ordinarily will not "second guess the litigants before us and grant them relief they did not request, pursuant to legal theories they did not outline, based on facts they did not relate," *United States v. Pielago*, 135 F.3d 703, 709 (11th Cir. 1998) (quoting *Adler v. Duval Cty. Sch. Bd.*, 112 F.3d 1475, 1481 n.12 (11th Cir. 1997)), parties cannot waive the application of the correct law or stipulate to an incorrect legal test. To the contrary, we have explained that even "confessions of [legal] error do not relieve this Court of the performance of the judicial function" because "[o]ur judgments are precedents, and the proper administration of the . . . law cannot be left merely to the stipulation of parties." *United States v. Matchett*, 802 F.3d 1185,

17

1194 (11th Cir. 2015) (alterations adopted) (citations and internal quotation marks omitted). Jefferson presented Jung's racial statement as a basis for her claim, and the district court was obliged to heed our repeated admonitions that "application of *McDonnell Douglas* is inappropriate" in the light of this direct evidence. *Alton Packaging*, 901 F.2d at 923.

3.    Jefferson Cannot Invoke Section 2000e-2(a)(2) for Her Claim of Disparate Treatment.

Jefferson also urges us to examine her allegation of disparate treatment under section 2000e-2(a)(2), but that provision, in contrast with section 2000e-2(a)(1), applies not to discrete decisions made by an employer directed at an individual employee, but to categorical policies that have a discriminatory purpose or effect. The whole text of the statute supports this distinction. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) ("The text must be construed as a whole."). Section 2000e-2(a)(1) forbids an employer from discriminating against individual employees, such as by "fail[ing] or refus[ing] to hire or . . . discharg[ing] *any individual*" or by "discriminat[ing] against *any individual* with respect to *his* compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1) (emphases added). In contrast, section 2000e-2(a)(2) takes aim at discriminatory policies of general application when it prohibits an employer from "limit[ing], segregat[ing], or

18

classify[ing] his *employees* or *applicants* for employment in any way which would deprive or tend to deprive any individual of employment opportunities." *Id.* § 2000e-2(a)(2) (emphases added). Although both provisions have the same *object* of curing discrimination in the workplace, they target different *mechanisms* of discrimination. *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2527 (2015) (Thomas, J., dissenting) (explaining that, under the plain language of the statute, "[t]he only difference between [section] 2000e-2(a)(1) and [section] 2000e-2(a)(2) is the type of employment decisions they address").

The Supreme Court acknowledged this difference in *Connecticut v. Teal*, 457 U.S. 440 (1982). It explained that an employment "examination, which barred promotion and had a discriminatory impact on black employees, clearly [fell] within the literal language of [section 2000e-2(a)(2)]" because "[t]he statute speaks, not in terms of jobs and promotions, but in terms of *limitations* and *classifications*." *Id.* at 448. And the Supreme Court recently reiterated that "the thrust of [section 2000e-2(a)(2)] [is] the consequences of employment *practices*." *Inclusive Cmtys.*, 135 S. Ct. at 2517 (emphasis added) (citation and internal quotation marks omitted).

In short, section 2000e-2(a)(1) covers individual decisions, such as the alleged decision not to transfer Jefferson on the basis of her race and national

19

origin, and section 2000e-2(a)(2) covers policies of general applicability. Because Jefferson's complaint concerns an individual employment decision, it may proceed under only section 2000e-2(a)(1).

C.    *The District Court Erred when It Granted Summary Judgment Against Jefferson's Claim of Retaliatory Termination.*

To establish a claim of retaliation, Jefferson must prove that she engaged in statutorily protected activity, that she suffered an adverse employment action, and that the adverse action was causally related to the protected activity. *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1193–94 (11th Cir. 2016). An employee's complaint about discrimination constitutes protected activity if the employee could "reasonably form a good faith belief that the alleged discrimination existed." *Taylor v. Runyon*, 175 F.3d 861, 869 (11th Cir. 1999). Termination is a materially adverse action. *See, e.g.*, *Goldsmith*, 513 F.3d at 1277. As to causation, "Title [Seven] retaliation claims require proof that 'the protected activity was a but-for cause of the alleged adverse action by the employer.'" *Trask*, 822 F.3d at 1194 (alteration adopted) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). Stated another way, a plaintiff must prove that had she not complained, she would not have been fired. Further, we must respect that an "employer [need not] have good cause for its decisions." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984). To the contrary, it "may fire an employee for a good reason, a bad reason, a reason based on

20

erroneous facts, or for no reason at all, as long as its action is not for [an unlawful] reason." *Id.*

The district court made three rulings when it granted summary judgment against Jefferson's claim of retaliatory termination. First, it approved the exclusion of a paragraph of Dye's affidavit that alleged that Jefferson was fired in retaliation for her complaint. Second, it determined that Jefferson's complaint was not protected conduct. Third, it determined that Jefferson had failed to produce sufficient evidence that Sewon's purported reasons for terminating her were actually a pretext for Sewon's retaliatory motives. The last two rulings were erroneous.

1.    The District Court Did Not Abuse Its Discretion when It Excluded the Paragraph of Dye's Affidavit that Alleged Retaliation.

Jefferson contends that the district court should have admitted a paragraph of Dye's affidavit that stated that "Jefferson was terminated because of her complaint of discrimination," but the district court did not abuse its discretion. Federal Rule of Civil Procedure 56(c)(4) demands that an affidavit "be made on personal knowledge." And the district court determined that Dye's affidavit did "not provide any facts from which to conclude that Dye had personal knowledge about the reasons for her termination." Jefferson offered no evidence that Dye controlled or participated in the termination decision, and we have explained that statements of "non-decisionmakers" ordinarily are inadmissible unless the record "reflect[s]

21

some kind of participation [by the affiant] in the employment decision or policy of the employer." *Kidd*, 731 F.3d at 1209 (citation and internal quotation marks omitted). Indeed, Horton's uncontradicted testimony established that Dye learned of the reasons for the termination "[a]fter the fact," and Jefferson even testified that Dye told her that "[h]e didn't know [why]" she failed her evaluations. Dye also failed to identify any other basis for his assertion, and "[t]his [C]ourt has consistently held that conclusory allegations without specific supporting facts have no probative value." *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (quoting *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)). In short, the exclusion of Dye's allegation did not involve "a clear error of judgment" or "appli[cation] [of] an incorrect legal standard." *Furcron*, 843 F.3d at 1304 (citation and internal quotation marks omitted).

Jefferson responds that, because Dye was a human resources specialist who handled Jefferson's state-level unemployment proceedings, he presumably would have had insight into why Jefferson was fired, but the scant facts in Dye's affidavit entitled the district court to reject this presumption. Dye failed to identify the source of his information or explain what facts led him to make this accusation.

2.     The District Court Erred when It Determined that Jefferson's Complaint Was Not Protected Conduct.

The district court reasoned that Jefferson's complaint about Jung's alleged statement was not "protected activity" because Jefferson could not have

22

"reasonabl[y] believe[d] that Sewon engaged in [discrimination]," but we disagree. A complaint about discrimination is protected if the plaintiff could "reasonably form a good faith belief that the alleged discrimination existed." *Taylor*, 175 F.3d at 869. The district court reasoned that Jefferson's grievance was baseless because "she was [not] qualified for the [new] position" and because "the denial of that position [did not] constitute[] an adverse action," but an employee need not be correct in her beliefs or consult a lawyer for expert analysis of her complaint—she need only "reasonably form a good faith belief." *Id*. Chung's report that Jung stated an intent to hire a Korean could have reasonably led Jefferson to conclude that racial discrimination was at play. Indeed, we explained in *Wideman v. Wal-Mart Stores, Inc.*, that an employee was entitled to complain when "her manager told her that the [desired] position would not be filled by a black person." 141 F.3d 1453, 1455 (11th Cir. 1998). Jefferson had a reasonable basis for her complaint.

3. The District Court Erred when It Ruled that Jefferson Failed To Produce Sufficient Evidence that Sewon's Reasons For Terminating Her Were a Pretext For Retaliation.

Sewon asserts that it fired Jefferson because she received failing scores on a pair of employment evaluations, and it contends Jefferson has offered no evidence to undercut this neutral rationale. It points out that these evaluations were tied to Jefferson's probationary status, that Jefferson knew she was "subject to termination at any time during this [period]," and that Jefferson has not produced evidence that

23

other employees kept their jobs after receiving failing scores. And Sewon highlights that Horton testified that neither evaluator knew what number constituted a passing score, so neither evaluator could have intentionally issued a failing report.

Although the above explanation and supporting evidence support Sewon's assertion that it had a non-retaliatory basis for firing Jefferson, we agree with Jefferson that a reasonable jury could nevertheless find that Sewon's explanation was pretextual and that Jefferson's complaint was the "but-for cause" of her termination. *Trask*, 822 F.3d at 1194 (citation and internal quotation marks omitted). First, there is the suspicious timing of the termination, which closely followed Jefferson's complaint of racial and national origin discrimination to the human resources manager. On August 23, Jefferson reported Jung's alleged remark that he wanted to fill the open position with a Korean. Kim filled out an evaluation of Jefferson on the same day, and Sewon fired Jefferson exactly one week later. We have cautioned that "mere temporal proximity, without more, must be very close" to suggest causation. *Thomas v. Cooper Lighting*, *Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citation and internal quotation marks omitted); *see also id.* ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."). But we have explained that an employee's termination within days—or at the most within two weeks—of his

24

protected activity can be circumstantial evidence of a causal connection between the two. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (explaining that the "close temporal proximity between [the plaintiff's] request for leave [under the Family and Medical Leave Act] and his termination—no more than two weeks, under the broadest reading of the facts—is evidence of pretext, though probably insufficient to establish pretext by itself."). Here, Jefferson's termination occurred only one week after she complained about discrimination.

Jefferson also offered evidence supporting her allegation of pretext. Kim, who was Jefferson's immediate supervisor, testified that she had never "filled out this type of [evaluation] for anyone else" or "reprimanded anyone else for" the same kinds of issues cited in her evaluation of Jefferson. And Kim's evaluation also stated that Jefferson was "work[ing] well and complet[ing] her tasks in a timely manner." Sewon also failed to follow its "progressive discipline policy" that affords employees several warnings, including a "written warning" and "final warning," before termination. In short, and taking all the circumstances together, the question whether Sewon fired Jefferson to retaliate for her complaint about perceived racial discrimination, is a question for a jury.

25

D.    *The District Court Committed No Error when It Granted Summary Judgment Against Jefferson's Claim of Discriminatory Termination.*

Jefferson also contends that Sewon terminated her for racially discriminatory reasons, but she offers no substantial evidence in support of this allegation. Instead, she reasons that when her managers gave her low evaluation scores for "going outside the chain of command," they were actually punishing her for failing to conform to "Korean culture" because "the chain of command" is inherent to "Korean cultural norms." Jefferson also points out that a portion of Dye's affidavit that the magistrate judge left intact alleged "that non-Koreans were targeted for reprimands and harsher discipline than Korean employees." She concludes that this evidence supports both a claim of disparate treatment, 42 U.S.C. § 2000e-2(a)(1), and disparate impact, *id.* § 2000e-2(a)(2).

We reject Jefferson's reasoning. With respect to the allegation that the Sewon subjected Jefferson to disparate treatment when it insisted that she follow the "chain of command," we have explained "that an employer's neutral policy" that has "adverse consequences, without more, is not sufficient to state a claim for disparate treatment." *Equal Emp't Opportunity Comm'n v. Catastrophe Mgmt. Solutions*, 852 F.3d 1018, 1026 (11th Cir. 2016). We see nothing inherently discriminatory about a policy that requires employees to respect corporate hierarchy, and we are not in the business of determining, without more, whether facially legitimate company practices are subtly linked to ethnic or racial groups.

26

Jefferson also contends that Sewon enforced this policy against non-Koreans in a discriminatory manner, and she points out that Dye's affidavit alleges that unspecified "American employees" were subject to stricter discipline than unspecified "Korean employees" at unspecified times. But Dye's affidavit says nothing about the particular policy at issue—the "chain of command." And even if it did, the vagueness of his accusations prevents them from establishing that Korean employees received lesser discipline for "*nearly identical*" behavior. *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1340 (11th Cir. 2015) (emphasis added) (citation and internal quotation marks omitted). Indeed, we have explained that "conclusory allegations without specific supporting facts have no probative value." *Leigh*, 212 F.3d at 1217 (quoting *Evers*, 770 F.2d at 986).

Nor can Dye's allegations that nameless Korean employees received favorable treatment in unspecified scenarios support a claim of disparate impact. His vague accusations come nowhere close to establishing that the specific practice at issue—the chain of command—had a "significantly discriminatory impact" on non-Korean employees. *In re Emp't Discrimination Litig. Against State of Ala.*, 198 F.3d 1305, 1311 (11th Cir. 1999) (quoting *Teal*, 457 U.S. at 446). We see no reason to conclude that these "conclusory allegations without specific supporting facts have . . . probative value." *Leigh*, 212 F.3d at 1217.

## IV. CONCLUSION

We **REVERSE** in part, **AFFIRM** in part, and **REMAND** for further proceedings in accordance with this opinion.