[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10640

_____

D.C. Docket No. 1:16-cv-02848-ELR

D'MARIUS ALLEN,

Plaintiff - Counter Defendant - Appellant,

versus

AMBU-STAT, LLC,

Defendant - Counter Claimant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(January 16, 2020)

Before BRANCH and MARCUS, Circuit Judges, and HUCK,[*] District Judge.

PER CURIAM:

_____

[*] Honorable Paul C. Huck, United States District Judge for the Southern District of Florida, sitting by designation.

D'Marius Allen appeals from the district court's grant of final summary judgment, rejecting her Title VII claims of sexual harassment and retaliation against her former employer, Ambu-Stat, LLC.  After careful review, and having heard oral argument, we conclude that no reasonable jury could have found in her favor on either claim.  Accordingly, we affirm.

I.

The relevant facts, construed, as they must be, in favor of Allen, the non-moving party, are these.  Appellee Ambu-Stat, LLC ("Ambu-Stat") is a provider of ambulatory services, primarily focused on transporting patients to and from appointments.  Ambu-Stat is co-owned by Rita Ortiz (51%) and her husband, Santos Ortiz (49%).  Rita is the executive manager and handles day-to-day operations.  Santos "generally" does not intervene in daily matters, instead working in the field, but Allen stated he "maintains input" in company operations.

On April 17, 2015, Ambu-Stat hired Allen as an emergency medical technician.  Allen claims sporadic sexual harassment during her time at Ambu-Stat, all of which we take as true.  For starters, Allen says Santos made several comments about her appearance.  On Allen's first day of work, Santos told her she was "really pretty."  On another occasion, responding to Allen's comments about her own weight, Santos told Allen she was "fine as hell" and not to worry.  Allen testified she was not offended by this comment.  Santos also made comments about

Allen's appearance that were more graphic: one time, Santos told Allen that she had a body like his ex-girlfriend, but better, with wider hips. And on another occasion, while moving a patient, Santos said, "[Y]ou got to watch that stuff on the table with that big old butt or you're going to knock it down trying to move her." Allen adds that Santos generally spoke with co-workers about how attractive he found Allen, although she does not provide any specific examples of these statements.

Allen also claims that Santos made three crude sexual references. The first or second time Santos and Allen worked together, a song came on the radio containing the lyrics "eating booty like groceries." Santos asked Allen, "[D]oes your boyfriend eat that thang?" Allen replied that her boyfriend did not and did not know how to do so. Santos answered, "I could teach him." Another time, while working out at a gym, Allen recommended chocolate milk to help Santos with muscle soreness. A few hours later, Santos texted Allen that he loved chocolate milk, along with images of "tongue" emojis. This happened the same day as the comment Santos made about his ex-girlfriend. When working out together at the gym on another occasion, Santos pointed out Allen's groin area, which was wet with sweat, and commented, "Damn, that thing get wet like that!"

Allen further notes two instances of physical touching while in the office, although not by Santos himself. On each occasion, Allen observed Santos say

3

something to his <u>four-year-old</u> son, who then slapped Allen on her buttocks, and Santos and his son proceeded to laugh. When asked if she was offended by this, Allen testified she was "confused."

Three months after Allen started working at Ambu-Stat, on July 30, 2015, she was called into Rita's office for a meeting. Rita, Santos, and Allen were present, though Santos left at some point. Allen testified that the meeting began with Rita accusing her of having an affair and discussing her sex life with Santos. Allen claims Rita accused her of telling Santos "that [Allen's] boyfriend was boring in bed," which Allen denied. Allen explained that during the meeting, she told Rita that "most of the conversation that was started was by [Santos]." Allen also said she was having suicidal thoughts at some point during the meeting. Rita concluded the meeting by warning Allen that it was inappropriate to discuss her personal problems with Santos, because he was her employer.

Allen explained that she was caught off guard by Rita's accusations at the meeting, because she had previously thought she could talk to "[Rita and Santos] about anything because we all got along." She further explained that she "kind of latched onto them as family, like I could talk to [them] or invite [their] kids over, be, you know, friends outside of work." Allen also had invited their children to a birthday party.

4

One week later, on August 6, 2015, Rita issued a disciplinary Employee Correction Form to Allen for having had an "inappropriate conversation" with Santos while on duty. The form stated that "having such conversations while on duty with co-workers (or especially with my husband) is extremely inappropriate and unacceptable."

In reply, Allen wrote a note to Rita on the back of the form. It read this way:

> That conversation with Santos was not brought up by me. A song came on the radio where the female said "eat the booty like groceries." Santos asked me if my boyfriend ever "ate that thang" & I only answered HONESTLY & said "No, he doesn't know how." He didn't ask anything extra & I didn't volunteer anything extra. Even though it seems that you have this idea of me being attracted to him or "wanting" him (which I could be wrong) but I don't. Just like I told him, I love my boyfriend & that (oral sex) isn't important to me. I didn't come here to jeopardize my job or your marriage. I'm not that type of female & at 28, I still have no intentions to be.

> I enjoy working here & I'm in no place to be involved in any sexual harassment or marital issues that can easily be avoided. When I'm off, I don't wear anything disrespectful to myself, my relationship, or anyone else's. I don't come here to show off any assets. I've only come to this office out of uniform twice & I came directly to you & interacted with no one else. I'm not these "bitches" or "hoes" that like to deal with attached men. I don't want or need that karma in my life.

> I'm truly sorry if what I wear offended you or made you uncomfortable because those were not my intentions. You made it very clear how you felt about me & what I shared with you on that day of the meeting between us three & I totally respect that. I have a psychologist & psychiatrist, along with a pastor when I'm feeling suicidal . . . . It won't happen again[.] Any of it. You have my word on that. I don't know what was really said about me or why it was said but just like you told me before, choose my battles wisely. I'm

5

doing just that.  I'm staying away from anyone or anything that can hinder my growth here.

My apologies,
D'Marius Allen

After receiving this note, Rita testified that she found the content to be "outlandish," "disturbing," and "full of lies."  She also doubted that her husband would have used the phrasing "ate that thang," as Allen had described, because Spanish is his first language.  Rita presented the note to Santos as well, and he described it as "a lie."  Rita proceeded to terminate Allen on August 10.  She claimed Allen exhibited behavioral issues and provided "contradictory information" at the July 30th meeting and in her subsequent note.

That same day, after her termination, Allen reached out to Rita, stating by text message that "the things [Santos] said to me is considered sexual harassment, especially when he implied how much he 'loves chocolate milk' or how I had a body like his ex but better."  This was the first time Allen mentioned either of these comments.  The record does not reflect that Allen brought up the remainder of her allegations of misconduct at any time before presenting her claims to the EEOC on October 7, 2015 or before commencing this suit.

Allen sued Ambu-Stat in the United States District Court for the Northern District of Georgia, raising one claim of sexual harassment and one of retaliation under Title VII. She also raised several pendent state law claims including

6

negligent hiring, intentional infliction of emotional distress, invasion of privacy, and ratification. After discovery, Ambu-Stat moved for summary judgment. The district court granted the motion, adopting the magistrate judge's Report and Recommendation. This timely appeal followed.

II.

On appeal, Allen claims the district court erred in granting summary judgment on her sexual harassment and retaliation claims under Title VII, 42 U.S.C. § 2000e et seq. Allen also challenges the constitutionality of summary judgment as applied by the judges in the Northern District of Georgia in Title VII employment cases.

"We review de novo a district court's order granting summary judgment, taking all of the facts in the record and drawing all reasonable inferences in the light most favorable to the non-moving party." Peppers v. Cobb County, 835 F.3d 1289, 1295 (11th Cir. 2016) (citations omitted). After review, "[s]ummary judgment is proper where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)). To determine whether a factual dispute is genuine, we must consider whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Peppers, 835 F.3d at 1295 (quotation omitted).

We review questions of constitutional law de novo.  See United States v. Paige, 604 F.3d 1268, 1274 (11th Cir. 2010).

### III.

First, we are unpersuaded by Allen's claim that the district court improperly granted summary judgment on her sexual harassment claim under 42 U.S.C. § 2000e–2.  While Title VII does not explicitly reference sexual harassment, the Supreme Court has recognized a violation when "discrimination based on sex has created a hostile or abusive work environment."  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986).  Specifically, a court must determine whether "the conduct alleged . . . created a hostile work environment that exposed [the plaintiff] to disadvantageous terms or conditions of employment to which members of the other sex were not exposed."  Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808 (11th Cir. 2010) (en banc) (alteration adopted and quotation omitted).

Under Title VII, a plaintiff claiming sexual harassment must establish by a preponderance of the evidence the following:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

8

Id.

At issue in this case is the fourth element -- whether the harassment was severe or pervasive.  As we have explained, "Title VII is not a civility code, and not all profane or sexual language or conduct will constitute discrimination in the terms and conditions of employment."  Id. at 807.  Instead, the plaintiff must identify offensive conduct that is "severe or pervasive enough to alter the terms or conditions of employment."  Id.  To qualify as severe or pervasive, the work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (citation omitted).  In analyzing how objectively offensive the conduct is, we consider "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir.1999) (en banc) (citation omitted).  "Either severity or pervasiveness is sufficient to establish a violation of Title VII," and a plaintiff need not demonstrate both.  Reeves, 594 F.3d at 808 (emphasis in original).

Allen's first claim is that the conduct at issue was sufficiently pervasive.  We look to our governing case law to guide this analysis.  In Mendoza, the plaintiff

9

alleged four categories of harassing conduct: (1) one instance in which the alleged harasser said to Mendoza "I'm getting fired up"; (2) one occasion in which the alleged harasser rubbed his hip against Mendoza's hip while touching her shoulder and smiling; (3) two instances in which the alleged harasser made a sniffing sound while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and (4) the alleged harasser's "constant" following and staring at Mendoza in a "very obvious fashion."  195 F.3d at 1247.  This conduct occurred over 11 months.  Id. at 1249.  Nonetheless, we found these acts were not sufficiently pervasive to survive summary judgment.  See id. at 1247.

Then in Gupta v. Florida Board of Regents, we addressed a fact pattern that involved multiple attempts to make physical contact with the plaintiff, including touching the inside of her thigh, a ring on her finger, and a bracelet on her arm, as well as lifting the hem of her dress on one occasion.  212 F.3d 571, 579 (11th Cir. 2000), overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).  The putative harasser also repeatedly engaged the plaintiff outside of work, calling her house, at night, two to three times per week on average, sometimes asking if she was in bed and inquiring where her boyfriend was.  Id. at 578.  He also frequently asked her to lunch, and when she started having lunch with other co-workers, the harasser lashed out, calling the co-workers "racist" and "evil."  Id.  These incidents occurred over a period of six or seven

10

months.  Id.  at 579.  There too a panel of this Court found that the plaintiff failed to sufficiently establish the required level of pervasiveness.

When measured against Mendoza, we are satisfied that the conduct at issue in this case is not sufficiently pervasive.  Here, Allen points to five isolated comments.  These sporadic comments, spread over four months, can hardly be described as frequent.  Further, the comments appear to have been said in a joking manner, and in the overarching context of Allen being friendly with Santos (or working out together in a gym).  Indeed, Allen admitted she was "friends outside of work" with Santos and Rita.  We simply cannot say that these five comments, even taken in concert, and spread out over four months, are more pervasive than the conduct we rejected in Mendoza.

The facts here also fall short of the pervasiveness present in Gupta.  We have nothing resembling the frequent, unwelcome badgering detailed in Gupta.  The record here contains one-off comments spread across several months, made by an individual Allen called a friend.  Gupta not only had these types of comments, but also presented a fact pattern that included a continuous stream of unsolicited and disturbing interactions between the would-be harasser and the plaintiff, such as constantly asking her to lunch and regularly calling her at home and at night.  Indeed, the allegations in Gupta had an unsettling tenor to them, as these regular out-of-work calls involved asking the plaintiff personal questions such as if she

11

was in bed or if her boyfriend was nearby. 212 F.3d at 578. Further, unlike in Gupta, we have no repeated attempts by Santos himself to touch Allen. The five off-color comments made over some four months of time are far less pervasive than the ongoing, unwelcome, and arguably frightening interactions in Gupta. The plaintiff has not presented anything near the pattern of conduct presented and rejected by the Court in Gupta.

In support of her claim of pervasiveness, Allen relies primarily on Johnson v. Booker T. Washington Broadcasting Service, Inc., 234 F.3d 501 (11th Cir. 2000). But Johnson is inarguably different. There, the plaintiff alleged the defendant repeatedly attempted to massage her; rubbed his body parts against her; asked about her sex life; and pulled up his pants to reveal an imprint of his genitals. Id. at 506. In total, the plaintiff claimed roughly 15 incidents over a period of four months. Id. at 509. Allen cites to Johnson to show that near-daily incidents are not required and claims that we must allow a jury to decide if 10 incidents over four months is sufficient. However, our case law has never demanded daily incidents; there is no required benchmark of incidents per day or week or month. We cannot simplify this area of law to an arithmetic formula. Frequent conduct, be it daily or otherwise, is an important marker of pervasiveness. Mendoza, 195 F.3d at 1246. But we still must analyze the overarching context of the work environment when determining if the misconduct is objectively pervasive. That is, the frequency of

12

activity may be important but not determinative: the underlying conduct must still be sexual in nature and subject the plaintiff "to disadvantageous terms or conditions of employment to which members of the other sex were not exposed." Reeves, 594 F.3d at 808 (emphasis added) (alteration adopted and quotation omitted).

The conduct in Johnson is plainly different than the facts presented here. In Johnson, the defendant repeatedly attempted to touch the plaintiff. Here, Santos' four-year-old son touched Plaintiff twice in the buttocks and did not offend Allen in the process. Overall, Johnson involved repeated, intense harassment, enhanced by a highly present physical element. The acts in Johnson occurred both with a higher frequency and were fundamentally different in nature than those in the instant case.

In short, Allen's pervasiveness argument fails to pass muster. Plainly, Santos engaged in unsavory and unpleasant conduct. However, as we have emphasized, this type of boorish behavior, with this kind of frequency, is insufficient to constitute pervasiveness for a sexual harassment action under Title VII. After reviewing Allen's claims, and comparing them against those in which this Court has rejected claims of pervasive harassment, we are required to come to the same conclusion.

13

As for severity, the Allen's brief mentioned both the severe and pervasive prongs. The thrust of the brief, however, addressed the pervasiveness of the alleged misconduct. In contrast, the brief discussion about severity failed to identify any specific conduct that Allen believed would objectively qualify as severe, instead focusing on the subjective impact of the workplace environment on her mental state. In stark contrast to her pervasiveness claim, where Allen listed 10 incidents, the severity claim was offered only at the highest order of abstraction. It did not link any of the alleged acts of misconduct to the standard as we've explicated it. At oral argument we asked counsel directly whether he was traveling on the theory that Santos' conduct created a severe <u>or</u> pervasively hostile work environment. Counsel answered that his claim was grounded solely on the pervasive prong.

Specifically, the exchange read this way:

> The Court: Do you want to take just a moment to address, or do you want to sit on your motion and your briefing on the severe or pervasive prong?
>
> Allen's Counsel: If I may take a minute on the severe and pervasive prong to explain where I'm going with this. So our main contention with the sexual harassment issue is that it cannot be taken in isolation based on number of incidences. Now there are no magic number of incidences that raise to the threshold required for pervasiveness.
>
> The Court: <u>Your position is not that it was severe, but that it was pervasive?</u>

14

Allen's Counsel: <u>That's correct.</u>  And we're saying that the pervasiveness itself has to be tested in accordance to the entire social context.

(Emphases added).  No reference to severity was made by appellant's counsel following this exchange.

The law of this Circuit is clear that an argument can be abandoned at oral argument.  Thus, for example, in <u>Holland v. Gee</u>, the plaintiff appealed a district court decision to vacate a jury award of back pay.  677 F.3d 1047, 1053 (11th Cir. 2012).  The defendant initially argued in his briefs that the district court did not err by precluding back pay under the after-acquired evidence doctrine and that he preserved that argument for appeal.  <u>Id.</u> at 1064.  But "[a]t oral argument, however, [the defendant] abandoned all of these arguments" and acknowledged that the district court erred.  <u>Id.</u>  A panel of our Court recognized this as abandonment and discussed the issue further only in dicta.  <u>Id.</u>  See also <u>RES-GA Cobblestone, LLC v. Blake Constr. & Dev., LLC</u>, 718 F.3d 1308, 1313 n.6 (11th Cir. 2013) (finding the plaintiff "expressly disavowed at oral argument (and therefore abandoned) any entitlement to post-judgment interest"); <u>AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.</u>, 508 F.3d 995, 1003 (11th Cir. 2000) (declining to address one of plaintiff's arguments because the plaintiff "wisely abandoned this position at oral argument").

15

Any abandonment at oral argument must be unambiguous and explicit. See Crowe v. Coleman, 113 F.3d 1536, 1542 (11th Cir. 1997) (explaining that "waivers and concessions made in appellate oral arguments need to be unambiguous before they are allowed to change the outcome of an appeal"); see also 5 Am. Jur. 2d Appellate Review § 501 ("Courts consider claims abandoned at oral argument to be waived, although there is authority that such abandonment must be explicit."). Cf. State Treasurer v. Barry, 168 F.3d 8, 13 n.8 (11th Cir. 1999) (refusing to treat a claim as abandoned because the language used at oral argument reflected a "conditional renunciation"). We find the exchange in this case to amount to a clear and unambiguous abandonment -- Allen's counsel answered, "That's correct" when asked, point blank, if he was not proceeding on a severity argument. Given all of this, we treat Allen's severity argument as having been abandoned, and not without good reason. Moreover, we doubt whether Santos' alleged misconduct could meet the standards for severity that we erected in Mendoza and Gupta, even if appellant had not abandoned this prong of her sexual harassment claim.

## IV.

We are also unpersuaded by Allen's argument that the district court erred in granting summary judgment on her Title VII retaliation claim. Allen says that she was fired in response to her allegations of sexual harassment at the July 30th

meeting and in her August 6th note.  The district court found that there was no retaliation because Allen did not complain about unlawful activity.

Under 42 U.S.C. § 2000e-3(a), an employer cannot discriminate against an employee because of opposition to any "unlawful employment practice."  To establish a prima facie claim of retaliation under Title VII, a plaintiff must demonstrate that she (1) engaged in a statutorily protected activity; (2) suffered an adverse employment action; and that (3) the two are causally related.  See Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).  The burden then shifts to the defendant to offer a legitimate reason for the adverse action; if the defendant can do so, the plaintiff then must prove that the proffered reason is mere pretext for prohibited, retaliatory conduct.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).[1]  The protected expression must occur before the adverse employment action.  See Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1201 (11th Cir. 2001).[2]

To prove she engaged in statutorily protected activity, Allen must demonstrate that she held a "good faith, reasonable belief that the employer was engaged in unlawful employment practices."  Little v. United Techs., Carrier

[1] Allen argues that should we take an alternative approach to the causality analysis.  We do not comment on her argument because we do not address causality in this case.  Instead, Allen's claim fails because she cannot identify any statutorily protected activity.

[2] We thus disregard the text messages Allen sent to Rita that clearly complained about sexual harassment because they occurred only after she had already been let go.

17

Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997).  Specifically, she must show that she "reasonably believed that [s]he was opposing a violation of Title VII by h[er] employer."  Id.  (Emphasis added).  This belief has both an objective and a subjective component.  Id.

Critical to our analysis, the "opposition clause by its very nature focuses upon the motive of the employee, covering only one who has opposed any practice which violates Title VII."  Merritt v. Dillard Paper Co., 120 F.3d 1181, 1187 (11th Cir. 1997) (quotation omitted).  Here, Allen does not adequately demonstrate that she engaged in statutorily protected activity because she cannot identify any instance where she acted in opposition to an unlawful employment practice.  We analyze each of the proffered incidents in turn.

First, Allen offers her statement at the July 30th meeting with Rita and Santos claiming she "complained to [Rita] that conversations about sex were started by [Santos], in response to [Rita's] accusations against her."  This comment does not amount to opposition.  Merely discussing an incident is not enough; instead, Allen must point us to where she actively opposed the conduct.

During the meeting with Rita, Allen simply denied involvement with Santos and said she was "not that type of person."  She did not indicate in any way that she thought Santos' behavior was inappropriate or unwelcome.  Instead, she tried to "plead [her] case" with Rita.  Allen also admits that she did not bring up any

specific comments that Santos made to her during this meeting to avoid "drama." This reflects a rational and conscious decision <u>not</u> to act in opposition. Rather than confront Rita or Santos with the perceived misconduct, Allen tried to defuse the situation (as opposed to making a complaint in any form, which invariably would have heightened tensions). While it is possible that Allen was hesitant to accuse Santos of sexual harassment in front of his wife, our inquiry must consider whether Allen acted in opposition to an unlawful employment practice.

That Allen was trying to apologize and mend fences is further supported by her deposition testimony. She explained that at the meeting, she was confused by Rita's accusation because "I was letting her know that, you know, I thought I could talk to you guys about anything because we all got along." She also explained that she "kind of latched onto them as family, like I could talk to you guys or invite your kids over, be, you know, friends outside of work." This reinforces the idea that Allen thought she was close to the Ortizes and expressed her confusion at the situation, rather than stating her view that Santos had created a hostile work environment. Because she thought she could talk to Santos and Rita "about anything," her confused and defensive reaction when being accused by Rita is understandable. Again, however, this does not state or even imply that a complaint had been made. Allen simply tried to explain her actions and move on. We cannot classify what Allen said at the July 30th meeting as statutorily protected conduct.

19

Allen also says that her August 6th note should be construed as a complaint. We evaluate the note in the context of the July 30th meeting and the incident report to which it replied, along with the broader workplace environment. Ultimately, we must determine whether the note opposed unlawful conduct.

As we've noted, on August 6, 2015, Rita sent a disciplinary form to Allen. On the reverse side of the form, Allen sent Rita a note in response. In it, she described the specific "groceries" incident for the first time. She then disputed Rita's accusation, which Rita had raised in the July 30th meeting, that Allen was involved with or interested in Santos: "Even though it seems that you have this idea of me being attracted to him or 'wanting' him (which I could be wrong) but I don't. Just like I told him, I love my boyfriend & that (oral sex) isn't important to me. I didn't come here to jeopardize my job or your marriage. I'm not that type of female & at 28, I still have no intentions to be."

Allen used the phrase "sexual harassment" in the following paragraph, but only in the context of how much she wanted to keep her job: "I enjoy working here & I'm in no place to be involved in any sexual harassment or marital issues that can easily be avoided." Allen concluded her note with a slew of apologies. It is clear from the context that Allen mentioned the "groceries" incident not to oppose any practice, but to defend herself. Immediately after describing the incident, Allen tried to persuade Rita that she had no romantic interest in Santos. She

20

apologized and attempted to placate Rita by assuring her that Rita misunderstood the relationship between Allen and Santos, and that Allen was not attracted to him. She also explicitly said that she did not want to jeopardize her job.

While the note did use the phrase "sexual harassment," simply saying "sexual harassment" does not magically invoke statutory protection. Rather, Allen's reference to sexual harassment was entirely focused on her own actions, as opposed to those of Santos. After saying she did not want to jeopardize her job, she wrote, "I enjoy working here & I'm in no place to be involved in any sexual harassment or marital issues that can easily be avoided." (Emphases added). She then apologized again and gave her word that "[i]t won't happen again[.] Any of it." Combined with the preceding paragraph, the reference to sexual harassment was entirely focused on Allen's conduct, as opposed to that of Santos. Moreover, Allen did not so much as even reference any of the other claims of misconduct by Santos. She did not tell Rita anything about the "chocolate milk" incident, nor the other comments Santos allegedly made to her in the gym, nor indeed did she reference any comments that Santos made about her appearance. The failure to mention any of this to Rita, at the meeting on July 30th, or in her note on August 6th, further undermines any claim that Allen blew the whistle against Rita's husband for his purported misconduct, and that she was fired thereafter for having done so.

21

Allen urges this Court to view the note in its entirety and in the context of the events that preceded it. We have done so. As we've explained, Allen thought she was close to the Ortizes and desperately wanted to keep her job. This is demonstrated by Allen's own statements and her interactions with Rita at the July 30th meeting. This note is similarly apologetic in nature and focused on Allen retaining her job. Given the context, no reasonable jury could find that Allen acted in opposition to an unlawful employment practice. Allen claims on appeal that determining whether the note was oppositional conduct or an apology is "a matter of weighing the evidence." However, we do not find Allen's proposed interpretation, that the letter referenced sexual harassment in order to oppose it, to be reasonable. We need no scale to reach this conclusion; we are weighing nothing. The note is unambiguously an extended apology, along with a promise from Allen that this type of incident would not happen again. Taking the evidence in a light most favorable to Allen, we do not believe any reasonable jury could find that Allen's comments at the July 30th meeting or in her August 6th note amount to conduct in opposition to an unlawful employment practice.

## V.

Finally, we are wholly unconvinced by Allen's last argument, which broadly attacks the use of summary judgment by the district judges in Title VII cases in the Northern District of Georgia. Allen claims that the allegedly high rates of

summary judgment for defendants in Title VII cases in that district somehow violates the Seventh Amendment.  Remarkably, she asks this Court to enjoin all of the judges in the Northern District of Georgia from using summary judgment as a procedural vehicle in all employment cases in that district for two years.

For starters, the constitutionality of summary judgment is settled law.  As the Supreme Court has made clear time and again, summary judgment itself does not violate the Seventh Amendment.  The Seventh Amendment does not "bind the federal courts to the exact procedural incidents or details of jury trial" as they existed in England.  Galloway v. United States, 319 U.S. 372, 390 (1943).  Rather, "the Amendment was designed to preserve the basic institution of jury trial in only its most fundamental elements."  Id. at 392.  See also Jefferson v. Sewon Am., Inc., 891 F.3d 911, 919–20 (11th Cir. 2018) ("The Supreme Court made clear long ago that summary judgment does not violate the Seventh Amendment . . . . [S]ummary judgment . . . applies with equal force to claims of employment discrimination.").  Beyond that, we are required to examine each and every case on its own merit.  The disposition of a summary judgment application in one case by one judge tells us nothing about how we ought to review and adjudicate an order of final summary judgment entered by another judge in another case.  See id. at 920 ("[T]he district court does not intrude on the constitutional role of the jury when it considers

23

whether a complaint fails as a matter of law.  Settled precedent forecloses any argument to the contrary.").

Nor can we find anything in the studies Allen has cited which would yield the conclusion that somehow the judges in the Northern District of Georgia in the aggregate should be barred from using summary judgment in Title VII cases.  The statistical evidence offered is meaningless.  She cites to one study for the proposition that there is a disparity in the use of summary judgment in the districts in our Circuit and elsewhere.  See Joe Cecil & George Cort, Estimates of Summary Judgment Activity in Fiscal Year 2006, Federal Judicial Center (June 15, 2007), available at https://www.fjc.gov/sites/default/files/2012/sujufy06.pdf.  But the study Allen references does not even tell us which districts had these apparent disparities.  Nor has Allen offered anything by way of expert opinion or testimony explaining the relevance of her statistical disparities found among the district courts in the United States, or in this Circuit.  Nor does this study, which analyzed data in 2007, and only in that year, tell us anything about trends that may have occurred before or after 2007.  Nor finally are the references to other statistical studies any more convincing.

Although employment cases are both sensitive and difficult, summary judgment remains a useful tool in an appropriate case where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

24

law.  We are satisfied that the district court properly employed summary judgment

and granted final judgment for the appellee, Ambu-Stat.[3]

**AFFIRMED**.

---

[3] We affirm the district court's discretionary decision not to exercise supplemental jurisdiction over Allen's state law claims.  See 28 U.S.C. § 1367(c)(3); Milan Express, Inc. v. Averitt Express, Inc., 208 F.3d 975, 980–81 (11th Cir. 2000).

Allen has also raised for the first time in this Court a new discrimination claim -- that Allen was improperly terminated while Santos was not.  We will not review for the first time on appeal a new claim never raised in the district court.  See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1330–31 (11th Cir. 2004) ("This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." (quotation omitted)).