[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13175

_____

D.C. Docket No. 1:17-cv-02668-CAP

ROSE ROBERTSON,

                                        Plaintiff - Appellant,

versus

RIVERSTONE COMMUNITIES, LLC,

                                        Defendant - Appellee,

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 5, 2021)

Before ROSENBAUM, LAGOA, and ANDERSON, Circuit Judges.

PER CURIAM:

Rose Robertson, an African-American woman, appeals the district court's grant of summary judgment in favor of her former employer, Riverstone Communities LLC, on her claim of employment discrimination on the basis of race and her claims of interference and retaliation under the Family Medical Leave Act ("FMLA"). After careful review, we affirm.

## I.

### A. Robertson's Hiring and Promotion

In October 2012, Riverstone, a mobile-home property-management firm, hired Robertson to manage its Deer Creek Mobile Home Community ("Deer Creek") in Stockbridge, Georgia. Robertson's duties as property manager included striving to maintain 100% occupancy at her property, ensuring that outstanding rent was being collected,[1] and resolving complaints or issues raised by tenants.

Robertson initially performed well and won the award for 2013 Property Manager of Year. In 2014, shortly after winning the award, she was assigned a second property to manage, Clayton Village Mobile Park Community ("Clayton Village") in Jonesboro, Georgia. A few months later, in August, Riverstone promoted Robertson to Area Manager. As Area Manager, Robertson was responsible for supervising five properties and continuing to manage the Deer Creek

---

[1] Riverstone refers to its outstanding rent as "accounts receivable." Property managers are expected to collect as much rent as possible and keep accounts receivable low.

and Clayton Village properties. At the end of 2014, Robertson received a generally positive performance evaluation from her supervisor, Regional Manager Melissa Loeffelbein.

## B. Robertson's Demotion and Termination

During the first few months of 2015, though, according to Loeffelbein, Robertson had "severe performance issues with occupancy and AR" at her properties. So Loeffelbein, the then-Director of Property Management Sarah Riutta, and Riverstone's Human Resources Director Hilary Snyder decided to demote Robertson from her position as Area Manager. Nevertheless, they determined that Robertson would stay on as property manager at the Deer Creek and Clayton Village properties.

When Robertson returned to serving as property manager, Rene Scott became her new supervisor. Scott reported to Loeffelbein, who in turn reported to Riutta. On May 10, shortly after Robertson's demotion, Scott emailed Robertson to tell her that the occupancy and accounts-receivable numbers at the Deer Creek Property were stagnant and needed to improve right away; otherwise, Scott warned, Robertson could be subject to disciplinary action.

Over the month of May, the accounts-receivable and occupancy numbers at Deer Creek did get better. Besides that, another issue arose: Robertson was

3

responsible for opening two swimming pools at the Deer Creek property by Memorial Day, but despite her best efforts, the pools remained closed into June.

As a result, on June 3, 2015, Robertson received a written warning. The warning, which Scott wrote and Loeffelbein reviewed, detailed several performance issues, but it focused on the deteriorating occupancy and accounts-receivable numbers at Robertson's properties and on Robertson's failure to open the Deer Creek pools.

The warning also provided Robertson with a list of specific performance expectations. According to that list, Robertson was expected to open the pools immediately, lower the accounts-receivable rates for each property to under 3% by the end of July, and improve the occupancy numbers month after month. Robertson told Scott, Loeffelbein, and Snyder that she disagreed with aspects of the write-up, but she promised to "effectively and immediately" take care of the issues listed.

But things did not get better. Rather, the pools remained closed. So on June 10, Riutta emailed Robertson, emphasizing that she "need[s] these pools up and running. It is not fair to the residents and just plain poor customer service." She asked Robertson to give her an update "every[]day that the pool is not open." But the pools did not open in June.

On June 29, 2015, Loeffelbein completed a performance evaluation of Robertson for the first half of 2015. While the evaluation acknowledged that

4

"[Robertson] is dedicated to her job and does work very hard," it also stressed that she "needs to increase the occupancy and decrease [accounts receivable] immediately at both properties."

On July 14, Scott and Loeffelbein issued Robertson another written warning because one of the pools at Deer Creek was still not open. The pool remained closed because it failed an inspection for which Robertson and her team did not properly prepare.

Two days later, on July 16, Robertson left work because she had a migraine. Robertson's doctor, Dr. Rhonda Ross, diagnosed Robertson with high blood pressure and swollen feet, so she put her on bed rest until July 22. But on July 22, during Robertson's follow-up visit with Dr. Ross, Dr. Ross recommended that Robertson stay home from work until Monday, July 27, 2015. Robertson returned to work on July 27, 2015.

The following day, July 28, Snyder and Loeffelbein traveled to Georgia, and the next day, July 29, they went on a site visit at the Deer Creek property with Scott. Robertson was not at the property when they visited because she was at a church function.

That day, on July 29, Snyder emailed Riutta suggesting that they consider terminating Robertson's employment. So Scott, Loeffelbein, Snyder, and Riutta discussed Robertson's recent performance and decided to terminate her

5

employment.    That evening, Snyder drafted and circulated a "Team Member Termination Form" for Robertson.  Scott helped fill in the form by providing some of the occupancy numbers.

On July 30, 2015, Scott, Snyder, and Loeffelbein met with Robertson, delivered the termination form, and told her she was being terminated for performance reasons.   The form explained that "occupancy and outstanding [accounts receivable] have been moving in the wrong direction at Deer Creek."  For example, the form noted that Deer Creek had 499 units to be occupied, but the occupancy number decreased from 497 units at the end of May to 487 at the end of June.[2]  As additional reasons for firing Robertson, the form also listed Deer Creek's "lackluster" "overall appearance," rising resident complaints at Robertson's properties, and the fact that one of the Deer Creek pools remained closed.  The form concluded by stating, "It does not appear that [Robertson] is committed to turning this property around, therefore, we have no choice but to terminate her employment effective immediately."

## C. Race-based Incidents

Robertson presented evidence that Scott had used racist language while working for Riverstone.  First, when Robertson won her Property Manager of the

---

[2] Robertson informed Riutta in an email that the occupancy at Deer Creek would fall to 481 by the end of July.

6

Year award, a property manager named "Nicole" told Robertson at the awards ceremony in early 2014 that she won the award only because she was Black. Scott, who was not Robertson's supervisor at the time, agreed with Nicole and said "yes, [Robertson] won it because she's Black." Robertson thought the comments were disrespectful and offensive, but she simply walked away, attempting to diffuse the situation.

After Robertson was fired, she spoke with Shannon Smith, one of her former supervisors at Riverstone. Although Smith left Riverstone in March 2014, she told Robertson about an incident that occurred when she was still working for Riverstone. According to Smith, she asked Scott to go to the Atlanta area to help with a struggling property. And Scott responded, "There's too many f***ing n*****s in Atlanta[.] I'm not going there." Smith also said that Scott told her on multiple occasions that she "hated n*****s" and that she overheard Scott say "n*****" more than 20 times. For her part, Scott denied ever saying "n*****" and making any of these statements. Snyder, Riutta, and Loeffelbein likewise testified that they never heard Scott say "n*****" or say anything negative about Black people.

Besides these incidents, Robertson testified that she sought permission from Scott and Loeffelbein to give written reprimands to two different employees, one white and one black, for engaging in similar conduct. Robertson said that Scott and Loeffelbein approved the reprimand of the Black employee, but not the white

7

employee. According to Robertson, when she followed up with Loeffelbein about issuing discipline to the white employee, Loeffelbein said that "he is a good guy." Scott recalled that Robertson's written reprimand for the white employee was difficult to follow, so she edited it but ultimately approved the reprimand. Loeffelbein testified that she did not remember the incident.

### D. Procedural History

Based on these events, Robertson filed this action on July 14, 2017. Robertson alleged in her amended complaint (the operative complaint here) that Riverstone terminated her because of her race, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e) and 42 U.S.C. § 1981. She also asserted that Riverstone interfered with her rights under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 *et seq*., and retaliated against her for asserting her rights under the Act.

After discovery ended, Riverstone filed a motion for summary judgment. The magistrate judge assigned to the case issued a report and recommendation recommending that Riverstone's motion be granted on all claims. Robertson filed objections to the magistrate judge's report, but the district court rejected her arguments and adopted the magistrate judge's recommendation. After the district court entered judgment, Robertson filed this appeal.

8

**II.**

We review de novo a district court's grant of summary judgment. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). Summary judgment is properly granted if the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Strickland*, 692 F.3d at 1154. For purposes of evaluating the motion for summary judgment, we decide all factual issues and draw all reasonable factual inferences in favor of the non-moving party. *Strickland*, 692 F.3d at 1154. We may affirm the district court's judgment on any ground that is supported by the record. *Id*.

**III.**

Robertson contends that she was fired because of her race, in violation of Title VII of the Civil Rights Act of 1964. Title VII makes it unlawful for employers to "discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *See* 42 U.S.C. § 2000e-2(a)(1).[3] As we have noted, the statute prohibits "disparate

---

[3] Robertson also made a race-discrimination claim under 42 U.S.C. § 1981. The analysis for Robertson's section 1981 claim is the same as it is for her Title VII claim. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (noting that Title VII and Section 1981 claims "have the same requirements of proof and use the same analytical framework").

treatment of, or intentional discrimination against," employees based on race. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 920 (11th Cir. 2018) (citation and internal quotation marks omitted).

To survive summary judgment on her disparate-treatment claim, Robertson must establish that at least a material issue of fact exists over whether Riverstone engaged in intentional discrimination. *See id*. at 921. She may do this by pointing to either direct evidence, or, in the alternative, circumstantial evidence. *See id.* Here, Robertson argues she can make the necessary showing either way.

**A. Direct Evidence**

We start by evaluating whether Robertson has presented direct evidence of disparate treatment. Direct evidence is "evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption." *Jefferson*, 891 F.3d at 921 (alterations adopted and citation and internal quotation marks omitted); *see also Standard*, 161 F.3d at 1330.[4] In applying this definition, we have "marked severe limits for the kind of language to be treated as direct evidence of

---

[4] Robertson argues that *Wright v. Southland Corp.*, 187 F.3d 1287, 1293 (11th Cir. 1999), articulates the correct definition of "direct evidence" in this Circuit: "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic." But the *Wright* definition is not precedential. The two other judges on the panel concurred in judgment only; they did not join the lead opinion's articulation of the direct-evidence standard. *Id*. at 1306. We review our binding precedent above.

discrimination." *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998).  The prototypical example of direct evidence includes "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of" race.  *Jefferson*, 891 F.3d at 922 (citation and internal quotation marks omitted).

On the other hand, remarks that are not tied to a challenged employment decision or are made by non-decisionmakers do not qualify under our definition of direct evidence of discrimination.  *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002); *Cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring in judgment) (finding that "stray remarks in the workplace" or "statements by non-decisionmakers, or statements by decisionmakers unrelated to the decision process" cannot justify shifting the burden to the employer to show that its decisions are legitimate).

Under our stringent definition of direct evidence, the statements attributed to Scott, although racist and abhorrent, are not direct evidence of discrimination because Scott did not make them in the context of Riverstone's decision to fire Robertson.  Rather, Scott made her remarks[5] at least a year before she became

---

[5] As we have noted, for purposes of reviewing the order on Riverstone's motion for summary judgment, we resolve all factual issues in favor of the non-moving party—here, Robertson.  *See Strickland*, 692 F.3d at 1154.  For that reason, this opinion assumes all statements attributed to Scott occurred.  If this case were to proceed to trial, Robertson would be required to prove that Scott, in fact, made the statements.

11

Robertson's supervisor; her racist statement that Robertson won the property-manager-of-the-year award only because she is Black and her repeated, racist remarks—including use of the word "n*****"—in front of Smith, all happened in the first half of 2014 or earlier. While Scott's reprehensible comments reflected generalized animus towards Black people and logically could suggest that such animus could have colored Scott's employment decisions, that is not enough under our binding precedent because the comments were not tied to Riverstone's decision to fire Robertson or to Scott's supervision of Robertson. Nor was Scott even the sole, or ultimate, decisionmaker—further diluting the connection between her statements and Robertson's termination. For these reasons, we cannot conclude that Scott's comments constitute direct evidence of discrimination concerning the employment decisions at issue.

This conclusion is supported by our decision in a factually similar case: *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223 (11th Cir. 2002). There, the plaintiff's supervisor, like Scott in this case, made a racist comment more than a year before the plaintiff was terminated and before he served as the plaintiff's supervisor. *Id*. at 1227. And like Scott's statements, the *Suncoast* supervisor's remark reflected general racial animus that could not be tied to the plaintiff's eventual termination; specifically, the supervisor said, "We'll burn his black ass," after the supervisor filled in for the plaintiff while he was on jury duty. *Id*. Given the circumstances of

12

the supervisor's remark, we concluded that the supervisor's previous comment "was simply too far removed and too indirectly connected to the termination decision to constitute direct evidence of discrimination under the law of this circuit." *Id*. at 1228.

Robertson cites several cases in support of her argument that the temporal proximity of the statements is not dispositive and that general discriminatory remarks unrelated to the employment decision can serve as direct evidence of discriminatory intent. But every one of the cases on which Robertson relies is distinguishable because they involve statements that were made by the sole decisionmaker, statements that were related to the employment decision, or statements that were temporally proximate to the employment decision. *See*, *e.g.*, *Haynes v. W.C. Caye & Co.*, 52 F.3d 928, 930-31 (11th Cir. 1995) (concluding that the company president's statement that women are "not competent enough to do" the job plaintiff wanted was direct evidence of discrimination); *Burns v. Gadsden State Cmty. Coll.*, 908 F.2d 1512, 1518 (11th Cir. 1990) (holding that the decisionmaker's comment that "no woman would be named" to the job the plaintiff was seeking was direct evidence); *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923-24 (11th Cir. 1990) (finding that the decisionmaker's comment that "if this was his company he wouldn't hire any black people" was direct evidence).

13

True, as Robertson points out, there are some cases where we concluded that statements made over a year before an employment decision nonetheless constituted direct evidence, but even those cases involved statements decisionmakers made about employment decisions. *See, e.g.*, *Buckley v. Hosp. Corp. of Am.*, 758 F.2d 1525, 1530 (11th Cir. 1985) (concluding that the sole decisionmaker's statements that he wanted "new blood" and intended to recruit younger staff was direct evidence, even though some statements were made years before the employment decision).[6] By contrast, Scott's comments were not about the employment decision, and she was not the sole, or ultimate, decisionmaker.

The only case that comes close to supporting Robertson's argument is *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1071 n.9 (11th Cir. 1990), where we held that "[d]iscriminatory motive may be proved by direct evidence of the hiring authority's racially discriminatory attitudes, regardless of whether it relates to the employment decision at issue." But the facts of *Beverage Canners* are easily distinguishable from this case. There, the hiring decisionmaker and other managers

---

[6] Robertson also relies on one of our retaliation cases, *Beckwith v. City of Daytona Beach Shores, Fla.*, 58 F.3d 1554 (11th Cir. 1995), to support her temporal-proximity arguments. In *Beckwith*, the City fired its fire chief for engaging in protected First Amendment conduct almost a year after he made his protected statements. *Id.* at 1566. We concluded that the time gap did not defeat the plaintiff's claim because the City had merely used a "slow and deliberate process to terminate" the fire chief to avoid liability. *Id.* *Beckwith* is a poor fit here because there is no evidence that Scott was in a position to or wanted to fire Robertson when she made her racist statements and was simply biding her time to avoid liability.

14

for the defendant company had made "flagrant, revolting, and insulting racially derogatory remarks towards and in the presence of" black employees—including frequent use of the word "n*****." *Id.* at 1068; *id.* at 1068 n.3. The district court concluded that the frequency of these remarks led to an environment of racial hostility. On appeal, we concluded that such "overwhelming evidence of racial hostility" that was perpetuated by the managers "constitute[d] direct evidence of discriminatory intent in management decisions." *Id.* at 1072.

There is no doubt that the comments Scott made were "flagrant, revolting, and insulting," but Robertson has not presented evidence that widespread racial hostility permeated Riverstone's managerial ranks. Indeed, the record contains no evidence that the three other individuals—Snyder, Loeffelbein, and Riutta—who collaborated on the decision to terminate Robertson used derogatory language or created an environment of racial hostility.[7]

---

[7] To be sure, use of the word "n*****" by a supervisor, even one time, may establish a hostile work environment. *See Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1251-54 (11th Cir. 2014); *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580-81 (D.C. Cir. 2013) (Kavanaugh, J., concurring). But Scott's statements, including her use of the word "n*****," cannot contribute to a hostile-work-environment claim for Robertson. As an initial matter, Robertson abandoned her hostile-work-environment claim because she did not raise the issue until her reply brief. We do not consider arguments raised in a reply brief for the first time. *United States v. Magluta*, 418 F.3d 1166, 1185-86 (11th Cir. 2005). And even if Robertson had preserved her hostile-work-environment claim, we agree with the district court that the claim failed because she never heard Scott make those comments and learned about them only after she was fired. *See Adams*, 754 F.3d at 1250 (courts cannot consider incidents "the plaintiff learned only after her employment ended or what discovery later revealed").

15

In sum, our binding precedent precludes the conclusion here that Robertson has presented direct evidence.

## B. Circumstantial Evidence

Plaintiffs alleging intentional discrimination can alternatively or additionally rely on circumstantial evidence. In contrast to direct evidence, circumstantial evidence is evidence that "suggests, but does not prove, a discriminatory motive[.]" *Jefferson*, 891 F.3d at 922 (citation omitted).

A plaintiff can prove circumstantial evidence in one of two ways.

First, and most commonly, a plaintiff can use circumstantial evidence to satisfy the *McDonnell Douglas* burden-shifting framework. *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc) ("*Lewis I*"). Under that framework, a plaintiff must demonstrate that the defendant employer treated similarly situated employees more favorably. *Id*. at 1220-21. But as Robertson's case demonstrates, making that showing is not always possible because "a proper comparator simply may not exist in every work place." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*").

So we have held that a plaintiff can also survive summary judgment with circumstantial evidence, without satisfying the *McDonnell Douglas* framework, by "present[ing] a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin*

16

*Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (cleaned up).   A "convincing mosaic"

may be shown by "among other things, (1) suspicious timing, ambiguous statements

..., and other bits and pieces from which an inference of discriminatory intent might

be drawn, (2) systematically better treatment of similarly situated employees, and

(3) that the employer's justification is pretextual."   *Lewis II*, 934 F.3d at 1185

(citation and internal quotation marks omitted).

Here, Robertson argues that she has presented a convincing mosaic that

includes (1) the suspicious timing of her termination; (2) other bits and pieces of

evidence; and (3) evidence that Riverstone's reasons for her termination are

pretextual.

### 1. Suspicious timing

Robertson first emphasizes the suspicious timing of her termination.   As

Robertson stresses, she was fired less than twelve weeks after Scott became her

supervisor.  And in that brief time, Scott issued two written warnings to Robertson,

chastising her for poor occupancy numbers and for failing to open the pools at the

Deer Creek property.  Plus, mere days after becoming Robertson's supervisor, Scott

emailed Robertson to let her know that her occupancy and accounts-receivable

numbers needed to improve immediately.

At first glance, the timeline Robertson describes could raise suspicions.  But

Robertson's timeline omits key undisputed facts.  Most significantly, Robertson

brushes over the fact that she was demoted from her position as Area Manager for performance reasons *before* Scott became her supervisor.[8]    After her demotion, Robertson's performance continued to dip dramatically.  For example, at the Deer Creek property, accounts receivable nearly doubled between March and the end of May of 2015, and occupancy decreased by 10 units in the month of June.  Robertson also failed to open the pools at the Deer Creek property, even though Riutta, Riverstone's Director of Property Management, repeatedly implored her to open them.  When we account for these additional facts, we cannot conclude that the timing of Robertson's termination is suspicious.

## 2.  Other bits and pieces

Robertson next argues that other bits and pieces of circumstantial evidence support her claim.  First, Robertson points to her testimony explaining that she, on separate occasions, sought to issue written reprimands to two maintenance employees, one white and one Black, for engaging in the same conduct, but she received permission to discipline only the Black employee.  Robertson contends that Scott's animus influenced the decision because when Robertson asked Loeffelbein

---

[8] Robertson argues that her performance during her stint as a property manager at the time she was also serving as the Area Manager should not be held against her because she claims her performance as a property manager at that time was still satisfactory.  But the record reveals that Robertson was demoted because of "severe" performance issues with the occupancy and accounts-receivable numbers at her properties, including the ones for which she was the property manager.  Those issues, which Robertson does not dispute, relate to her performance as both a property manager and the Area Manager.

why the written reprimand for the white employee had not been approved, Loeffelbein said that she and Scott talked, and they decided not to reprimand him.

But that evidence is not enough to show that any racial animus played a part in the decision not to reprimand the white employee. Even assuming Scott and Loeffelbein discussed the issue, Robertson has not presented any evidence to suggest that Scott said something to convince Loeffelbein that the white employee should not be disciplined. In fact, Scott testified that she signed off on the written reprimand for the white employee and sent it to Loeffelbein for approval. And Robertson expressly stated that she did not think Loeffelbein was racist, so there is no evidence that racial animus influenced her decision not to approve the write-up for the white employee.

Robertson also relies on testimony that the properties she managed were chronically unprofitable. She asserts that it was unfair for her to be fired, while other white employees who oversaw her properties did not improve their profitability numbers.

Robertson correctly characterizes the record as indicating that the properties she managed may not have been in a profitable market and continually struggled to perform to Riverstone's expectations. Indeed, Riutta testify that the properties Robertson managed were "not profitable and . . . in a bad market." And Loeffelbein

19

admitted that the properties struggled to maintain good occupancy and accounts-receivable numbers.

But this evidence cannot help Robertson much because even if Robertson's properties were not in a great market, her performance was still problematic, and her performance issues were not limited to the profitability of her properties. As we have noted, Robertson failed to open both pools at the Deer Creek property in a timely manner. In fact, when Robertson was terminated in July, one of the pools was still closed because it failed an inspection for which Robertson did not properly prepare.[9] That had nothing to do with the robustness of the market. And as to issues regarding the properties' occupancy and accounts-receivable metrics, even there, objective indicators supported Riverstone's conclusion that Robertson was underperforming. In particular, as we have mentioned, Deer Creek was nearly fully occupied at 499 units at the beginning of 2015 but fell significantly to an occupancy of 481 units by the end of July.

3. Pretext

Next, Robertson argues that Riverstone's reason for terminating her—her subpar performance—was pretext. Robertson contends that two pieces of evidence

---

[9] Robertson claims in her brief that she opened both pools by the time she was terminated at the end of July. But in her deposition, she testified that she did not recall whether the second pool was ever open. And her termination form indicates that the second pool was still not open when she was terminated. So the undisputed evidence of record shows that one of the pools was still not opened by the time Robertson's employment was terminated.

show pretext: first, evidence that Robertson's performance was better at the time she was terminated than it was in 2013 when she won the award for Property Manager of the Year, and second, Scott's racist statements.

With respect to Robertson's first pretext argument—that her performance at the time of her termination surpassed her performance at the end of 2013, the year she won Property Manager of the Year—Robertson points to unit-occupancy numbers for each period. She also notes that she had failed to open the Deer Creek pools by Memorial Day in the past, but she had never been reprimanded.

This argument assumes that an employer may never increase its standards without necessarily opening itself up for allegations of discrimination. That is not correct. *See Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002) (explaining that different supervisors "may impose different standards of behavior"). Here, while Robertson's occupancy numbers may have been higher when she was fired, her targets for occupancy and accounts receivable also changed. As Riutta testified, the performance of property managers is based on "the goals and the outcomes that we have set for every property *for that year*." And that she had not been punished in previous years for failing to open the pool by Memorial Day is similarly immaterial. Riutta and other supervisors repeatedly asked Robertson to open the pools in a timely matter. Yet Robertson had still failed to open one of the pools by the time she was fired at the end of July—two months after she was supposed to have opened both

21

the pools. It would not have been unreasonable for Riverstone to conclude that the failure to timely provide the properties' amenities may not have been wholly unrelated to the lower occupancy and higher accounts-receivable rates.

At the centerpiece of her mosaic, Robertson relies on the racist remarks attributed to Scott. Robertson argues that even if Scott's racist comments are not direct evidence of discrimination, they are so "despicable and disdainful" that, on their own, they provide sufficiently strong circumstantial evidence to make out a case of race discrimination.

Racist statements that "are either too remote in time or too attenuated" from the employment decision to be direct evidence can still be "circumstantial evidence to support an inference of discrimination." *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998); *see also Jones v. Bessemer Carraway Med. Center*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998).

But while generalized racist statements "may *contribute* to a circumstantial case for pretext," they are normally not "sufficient absent some additional evidence supporting a finding of pretext." *See Suncoast Beverage*, 295 F.3d at 1229; *see also Rojas*, 285 F.3d at 1343 (noting that comments "isolated and unrelated to the challenged employment decision" "can *contribute* to a circumstantial case for pretext").

22

*Ross*—a case on which Robertson relies—actually demonstrates this proposition. There, the plaintiff, who was Black, was fired for soliciting tips at his job delivering furniture. 146 F.3d at 1288. One of the supervisors who fired the plaintiff had made a racist comment several years earlier. *Id*. at 1291. We held that the district court erred when it refused to consider the racist comment as circumstantial evidence. *Id*. We ultimately concluded that the plaintiff had made out a prima facie case of pretext, but we did not rely on just the supervisor's racist comments. *Id*. at 1292. Rather, we pointed to evidence that one of the plaintiff's supervisors had also solicited tips but was never reprimanded or fired. *Id*. In short, the plaintiff needed more than just the supervisor's racist statements to make out a prima facie case.

Here, Scott's racist remarks are certainly circumstantial evidence that she might have discriminated. Scott's statements are particularly "despicable and disdainful": unlike the supervisor in *Ross*, Scott uttered more than one single or isolated remark—including the use of the word "n*****" more than 20 times. The statements reflect an inexcusable and deep-seated animus against Black people. In particular, the word "n*****" "powerfully [and] instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African Americans," *Ayissi-Etoh*, 712 F.3d at 580 (Kavanaugh, J., concurring), and

23

it evokes "a history of racial violence, brutality, and subordination." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004).

But on this record, that is not enough. First, as we have noted, Scott was not the primary, or even ultimate, decisionmaker, and the record contains no evidence that the other decisionmakers were at all influenced by racial bias. On the contrary, Robertson has conceded that she does not think the other decisionmakers were racist. Scott's statements also occurred outside the context of and well before the decision to fire Robertson. And Riverstone has identified objective and legitimate business reasons for Robertson's termination—her sustained decline in performance. Under these circumstances, Robertson needed to present other circumstantial evidence of discrimination to create a material issue of fact concerning pretext. But she did not do so.

Nor are we convinced by Robertson's argument that Scott's statements by themselves suffice because her participation in the decision to terminate Robertson tainted the decision with her racial animus. In appropriate circumstances, a plaintiff can prove discriminatory intent by showing that the employer's decisionmaker "rubber stamp[ed]" a "biased recommendation" to fire the plaintiff. *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999); *see also Anderson v. WBMG-42*, 253 F.3d 561, 566 (11th Cir. 2001) ("Disparate treatment analysis requires that none of the participants in the decision making process be influenced by racial

24

bias.") (citation and internal quotation marks omitted); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1565 (11th Cir. 1987) (reversing a district court's grant of summary judgment to a defendant where the decisionmaker was influenced by the plaintiff's direct supervisor to retaliate against the plaintiff for refusing his sexual advances).

But here, the record is devoid of any evidence that Scott's racial animus influenced her decision or the other decisionmakers. Snyder, Riutta, and Loeffelbein testified that they never heard Scott use the word "n*****" or say anything negative about Black people. Nor does the record allow for the conclusion that these three decisionmakers simply "rubber stamped" a recommendation from Scott. Rather, Snyder was the one who initiated the conversation about firing Robertson and wrote the initial draft of the termination form. And all three of these decisionmakers had independently demoted Robertson for performance reasons *before* Scott was involved. At bottom, no evidence supports the notion that Scott's racial animus infected the ultimate decision to terminate Robertson.

***

In sum, Robertson has not presented a convincing mosaic of circumstantial evidence showing that Riverstone's reason for terminating her employment was pretextual. Even though Scott's racist statements serve as circumstantial evidence, on this record, they are not, on their own, enough to prove pretext. So without the

25

support of any other convincing circumstantial evidence, the district court did not err in granting Riverstone's motion for summary judgment as to Plaintiff's disparate-treatment claims.

## IV.

Next, we address Robertson's FMLA claims. The FMLA provides "eligible employee[s]" with twelve workweeks of leave during any twelve-month period, for serious health conditions that prevent the employee from doing her job. 29 U.S.C. § 2612(a)(1)(D). The FMLA also prohibits employers from interfering with an employee's leave rights under the Act and retaliating against employees who exercise their leave rights. 29 U.S.C. § 2615(a). To prove an FMLA interference or retaliation claim, an employee must show that she was an "eligible employee"— defined under the Act as an employee who, among other things, has worked at a worksite with at least fifty employees within a 75-mile radius. 29 U.S.C. § 2611(2)(A)-(2)(B).

The parties dispute whether Robertson is an "eligible employee" as defined by the FMLA. The undisputed evidence in the record shows that Robertson is not an eligible employee. Snyder testified that Riverstone does not have at least fifty employees within a 75-mile radius of the properties where Robertson worked. But Riverstone did erroneously admit in its answer that Robertson was an "eligible employee," and the district court denied Riverstone the opportunity to amend its

answer after Snyder gave her deposition. Nevertheless, the district court ultimately concluded that Riverstone was not bound by its admission because the admission was a legal conclusion. So the district court granted Riverstone summary judgment on the FMLA claims because it found that Robertson was not an "eligible employee." Now, on appeal, Robertson argues that Riverstone should be bound by its admission.

In general, "a party is bound by the admissions in his pleadings." *Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983). However, admissions as to legal conclusions are "of questionable importance." *See Almand v. Dekalb Cnty., Ga.*, 103 F.3d 1510, 1514 (11th Cir. 1997); *MacDonald v. General Motors Corp.*, 110 F.3d 337, 341 (6th Cir. 1997) (explaining that the court is "reluctant to treat" statements of legal conclusion "as binding judicial admissions.") (citing *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir. 1963)). And courts are instructed to construe pleadings "so as to do justice." Fed. R. Civ. P. 8(e).

The admission here—that Robertson is an "eligible employee"—fits that exception because it is a legal conclusion. Riverstone did not admit to any factual allegations—say, that it had seventy-five employees within a fifty-mile radius of Robertson's worksite. Instead, it admitted to the allegation that Robertson "was an

27

'eligible employee' under the FMLA." As a pure legal conclusion, this contention is not subject to binding admission.

In addition, the admission here did not prejudice Robertson. Once Snyder testified in her deposition that Robertson was not an eligible employee, Robertson had notice that the issue was in dispute. Despite this, Robertson declined to ask Snyder more questions about the issue. Riverstone also moved to amend its complaint before discovery ended,[10] providing Robertson ample opportunity to develop facts on the issue during discovery. In fact, Riverstone offered to extend the discovery deadline to allow Robertson the time to collect more discovery on this issue, but Robertson declined.[11]

For these reasons, we conclude that the district court did not err in excusing Riverstone's admission and in ultimately finding that Robertson's FMLA claims failed because she did not qualify as an "eligible employee."

---

[10] This fact distinguishes this case from many of the non-binding cases on which Robertson relies in her briefs. *See*, *e.g.*, *Mo. Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1315 (8th Cir. 1990) (rejecting a defendant's attempt to amend its pleading concerning a factual issue *after the district court already entered its summary judgment order*); *E.E.O.C. v. Pines of Clarkston*, 2015 WL 1951945, at *2-3 (E.D. Mich. Apr. 29, 2015) (rejecting a defendant's attempt to correct its mistake of fact months *after discovery closed*).

[11] In her reply brief, Robertson argues that this case is like *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006). There, the Supreme Court held that Title VII's definition of "covered employers" was not jurisdictional, so the issue could not be raised after trial. *Id*. at 503-04. But *Arbaugh* does not impact our conclusion here. Even if we assume that the definition of "eligible employee" in the FMLA is not jurisdictional like the Title VII covered-employer limitation, that does not change the fact that the admission was a legal conclusion and that Riverstone's effort to correct its mistake happened before discovery closed and well before trial.

28

## V.    Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED**.