[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10538
Non-Argument Calendar

_____

D.C. Docket No. 2:17-cv-00939-JEO


SANQUINETTE PORTERFIELD,

                                        Plaintiff - Appellant,

versus

SOCIAL SECURITY ADMINISTRATION,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(August 30, 2021)

Before JORDAN, JILL PRYOR, and LUCK, Circuit Judges.

PER CURIAM:

Sanquinette Porterfield appeals from the district court's grant of summary judgment in favor of her employer, the Social Security Administration, in her disability discrimination suit filed pursuant to the Rehabilitation Act of 1973, U.S.C. § 794 *et seq.* In her complaint, Mrs. Porterfield alleged that the SSA discriminated against her due to her disabilities—anxiety, depression, carpal tunnel syndrome, and migraines—and failed to make any reasonable accommodation.

On appeal, Mrs. Porterfield argues that the district court erred in ruling that she failed to establish a *prima facie* case. For the reasons set out below, we affirm.

# I

Mrs. Porterfield began employment as a Teleservice Representative/Customer Service Representative for the SSA in 2007. Her job was to her to answer phone calls from the public at the Teleservice Center in Birmingham, Alabama.

In 2009, Mrs. Porterfield fell and injured her left wrist, which required surgery and left her "with a permanent disability as a result of the injury." After taking several days off due to her surgery, Mrs. Porterfield returned to work. She was able to use only her right hand to perform her duties. Consequently, she developed carpal tunnel syndrome in her right wrist, for which she had surgery in 2011. Mrs. Porterfield has stated that her wrist injuries were work-related and thus covered by

2

worker's compensation. As a result of her treatment for carpal tunnel, she stated that she was "forced to take time [off] work to receive treatment and recover."

Mrs. Porterfield also suffers from migraine headaches. She provided the SSA with a letter dated May 19, 2014, from her physician which stated:

> Mrs. Porterfield is being treated in my office for chronic daily headaches and migraines, these are chronic life-long conditions. Migraines are unpredictable and may flare up from time to time. If the migraines cannot be controlled with the patient[']s medications she may be absent from work.

D.E. 58-1 at 45. In an effort to prevent getting migraine headaches from her computer station while at work, Mrs. Porterfield requested an accommodation and the SSA purchased a screen protector for her computer after her request was approved. Mrs. Porterfield routinely took leave when her medication failed to manage her migraines. The SSA never refused her leave time for her migraine headaches and designated those absences as leave time under the Family Medical Leave Act, 29 U.S.C. § 2615. *See* Porterfield Dep. at 71, 72-73, 106. Mrs. Porterfield developed anxiety and depression and stated that her chronic migraines, combined with her other disabilities, forced her to request intermittent leave under the FMLA.

The SSA provides several different types of leave to its employees, including sick leave, annual leave, and leave without pay ("LWOP"). Mrs. Porterfield asserts that all of her absences from December 4, 2012, through February 25, 2013, were

due to her worker's compensation and associated treatment, and that her absences from February 26, 2013, through February 17, 2015, were due to her migraines and other disabilities and that such leave thus qualified as workers compensation and/or FMLA leave. *See* D.E. 39 at 6. Furthermore, she contends that she "supported her disability condition with medical documentation from her physician." *Id*.

## A

On June 9, 2014, her first line supervisor, George Green, counseled Mrs. Porterfield over her leave situation and informed her that her absences were "in violation of regulations and policies of the SSA." In response, in July of 2014, Mrs. Porterfield contacted one of the SSA's Equal Employment Opportunity counselors. Mrs. Porterfield then filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC"), in which she asserted that the SSA had subjected her to discrimination when her supervisor, Mr. Green, conducted the interview to discuss her LWOP usage.

Mr. Green gave a statement to the EEOC as part of the charge of discrimination investigation. During his interview, Mr. Green told the EEOC investigator "that the leave that was discussed [during the counseling interview] was the leave [Mrs. Porterfield] requested for her migraine headaches." D.E. 62, Exh. 15

at 8. Mr. Green later testified, however, that the counseling session was due to her "leave balance" and "for the leave that she had taken." Green Dep. at 54-55.

In a "Record of Interview," Mr. Green wrote that the counseling interview with Mrs. Porterfield was to "discuss her leave record and the requirements for requesting and obtaining approved leave in advance." D.E. 58-1 at 41. The Record of Interview states that during the counseling Mr. Green discussed with Mrs. Porterfield the following: (1) her negative sick leave balance was 223.5 hours, and that she had a negative annual leave balance of negative 33 hours, which he described as being at a "critical stage and [that she] needs to make an effort to accrue leave;" (2) Mrs. Porterfield had used 79.5 hours of advanced annual leave, out of a maximum allowance of 80 hours, and that advanced sick leave would only be granted in cases of injury or serious illness; (3) Mr. Green explained to Mrs. Porterfield the process by which she should apply for leave, and the procedure for calling in for leave when and if it cannot be anticipated; (4) Mr. Green discussed her "frequent use of leave and the manner in which she requests sick leave," including "long periods of sick leave over the past nine [ ] months" that had "become a pattern for her since July 2013" (to which Mrs. Porterfield noted that she always had supplied documentation when requesting leave); and (5) Mr. Green discussed with her the effects of LWOP, and that LWOP was not an employee right, but rather was granted only in certain circumstances, including 12-week FMLA leave which

5

requires specific documentation. *See id*. at 41-43. Additionally, Mr. Green informed Mrs. Porterfield that going forward she needed to report to Section Manager Rhonda Groveman for further LWOP requests as she had surpassed 240 hours of LWOP, and thus her immediate supervisor lacked authority to grant additional LWOP. Mr. Green stated that as of June 9, 2014, Mrs. Porterfield had taken 601.75 hours of LWOP.

After Mr. Green placed a record of the leave counseling in her personnel file, Mrs. Porterfield claims that he disciplined her for taking leave due to her disability. Mrs. Porterfield stated that she was counseled "under the pretext that the leave counseling…was [Mr. Green's] attempt to provide information to [her] about her lack of leave."  Mrs. Porterfield does not dispute that the leave time balances were correct, but does not recall whether Mr. Green went over the negative leave balances with her. Mrs. Porterfield testified that Mr. Green had not covered all the above during their interview, which is why "when [she] got this write-up, [she] didn't agree with it and [she] rebutted it." Porterfield Dep. at 66.

Mrs. Porterfield believes that she was counseled for taking approved leave due to her disability, even though the SSA's employee policies "explicitly state that leave for [w]orker's [c]ompensation and FMLA should not be considered a leave pattern indicating an abuse of sick leave." *Id*. at 8. During the relevant period,

however, Mrs. Porterfield utilized a variety of categories of leave for a number of different reasons, including: (1) annual leave for vacation and advanced leave for trips with her daughter, *see* D.E. 58, Exh. 1 at 45-47; (2) leave to care for her daughter and her own hospital stay, *see id.* at 64; and (3) worker's compensation injuries, migraines, and fibromyalgia, *see id.* at 38-39.

Five months later, in December of 2014, Mrs. Porterfield received her PACS Performance Plan Non-Manager's Appraisal. This Performance Appraisal ranked her in four areas: interpersonal skills, participation, demonstration of job knowledge, and achievement of business results. Mrs. Porterfield received a 5 out of 5 rating in the first three categories. In the final category, however, she received a rating of 3 out of 5, causing her overall rating to drop to a 4.5. In the two prior years, she had received a rating of 5. During her performance appraisal discussion with Mr. Green, Mrs. Porterfield objected to her rating for achievement of business results stating:

> I totally disagree with this rating, you can not rate me when I'm not here. you can only rate me when I am here. How can you do an outstanding job [and] achieve the agency business result[s] when you are not here to service the American public.

D.E. 62-13 at 4. Mrs. Porterfield testified that she had received a lower bonus as a result of her rating and states that Mr. Green informed her that the reason for the lowered rating was because of her leave. *See* Porterfield Dep. at 81-82.

7

**B**

In addition to her adverse employment action claim, Mrs. Porterfield alleged that the SSA failed to provide her with any reasonable accommodation regarding her disability. She claimed that the nature of her migraines, as detailed in her doctor's note, essentially required that the SSA provide her with intermittent leave, with little to no notice, on the days that her migraine headaches could not be managed. The SSA argued that Mrs. Porterfield never submitted a request for such a reasonable accommodation and that even if she had, all of her leave requests were granted so it never failed to provide an accommodation.

Without addressing whether Mrs. Porterfield's doctor's note amounted to a request for a reasonable accommodation, the district court found that the accommodation allegedly requested was unreasonable as a matter of law. The court reasoned that her request essentially amounted to indefinite intermittent leave whereby she would be permitted to come and go from work whenever she got a migraine. Mrs. Porterfield timely appealed.

**II**

We review a district court's summary judgment order *de novo*. *See Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002). Summary judgement is

8

appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine dispute of material fact and the movant is entitled to judgement as a matter of law. *See* Fed. R. Civ. P. 56(a). An issue of fact is material if it "might affect the outcome of the suit under governing law" and it is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Western Grp. Nurseries, Inc. v. Ergas,* 167 F.3d 1354, 1360–61 (11th Cir.1999) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). However, "an inference based on speculation and conjecture is not reasonable." *Ave. CLO Fund, Ltd., et al. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013). Similarly, a "mere scintilla of evidence" supporting the nonmoving party's position will not suffice to defeat a grant of summary judgment. *See Brooks v. Cty. Comm'n of Jefferson Cty., Ala.,* 446 F.3d 1160, 1162 (11th Cir. 2006) (quotation marks omitted).

The Rehabilitation Act prohibits federal agencies from discriminating in employment against otherwise-qualified individuals with disabilities. *See Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000). The standards for determining liability under the Rehabilitation Act are the same standards as the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101. *See Ellis v. England*, 432 F. 3d 1321, 1326 (11th Cir. 2005) (cases involving the ADA "are precedent" for those involving the Rehabilitation Act); *Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir.

9

2017). The burden for establishing causation under the Rehabilitation Act, however, requires proof that the individual was discriminated against "solely by reason of her disability," while the ADA requires a lesser showing of "but for" causation. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008).

A plaintiff may prove disability discrimination in two ways—disparate treatment or a failure to make a reasonable accommodation. Disparate treatment involves discriminatory intent or animus and occurs when a disabled individual is treated differently than a non-disabled individual. *See* 42 U.S.C. § 12112(b). A failure to make a reasonable accommodation requires no animus and occurs where a covered entity fails to fulfill its affirmative duty to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). "The reasonable accommodation requirement is best understood as a means by which barriers to the equal employment opportunity of an individual with a disability are removed or alleviated." 29 C.F.R. § 1630, app. (2003).

A plaintiff may support her claim of discrimination through direct or circumstantial evidence. *See Jefferson v. Sewon America, Inc.*, 891 F.3d 911, 921

(11th Cir. 2018). "Direct evidence is evidence that, if believed, proves the existence of a fact without inference or presumption." *Id*. Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of the protected classification, constitute direct evidence of discrimination. *See E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990) (Title VII case) (holding production manager's statements to black employee that "you people can't do a ____ thing right" constituted direct evidence).

A disparate treatment claim under the Rehabilitation Act based on circumstantial evidence is analyzed under the burden-shifting approach of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Ctr. v. Sec'y, Dep't of Homeland Sec., Customs & Border Prot. Agency*, 895 F.3d 1295, 1303 (11th Cir. 2018). Under this burden shifting framework, if the plaintiff establishes her *prima facie* case of disability discrimination, and the employer proposes legitimate, nondiscriminatory reasons for its decision, then the plaintiff must show (or create an issue of fact) that the reasons were a pretext for discrimination. *See id*.

To establish a *prima facie* case of disability discrimination, a plaintiff must demonstrate that: (1) she has a disability; (2) she was a "qualified individual" for the position; and (3) she was subjected to unlawful discrimination as a result of her disability. *See Sutton v. Lader*, 185 F.3d 1203, 1207-08 (11th Cir. 1999). In order to

establish the third element, the plaintiff must show that she suffered an adverse employment action because of her disability. *See Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1445 (11th Cir. 1998) (ADA case).

As noted earlier, under the Rehabilitation Act the plaintiff must prove that the adverse employment action was "solely by reason of" her disability. *See* 29 U.S.C. § 794(a). We have previously held, however, that a plaintiff cannot prevail if she shows that her employer based the adverse employment action partially on her disability and partially on other factors. *See Ellis* 432 F.3d at 1326 (Rehabilitation Act case holding that "[i]t is not enough [under the Rehabilitation Act] for a plaintiff to demonstrate that an adverse employment action was based partly on his disability."). To establish an adverse employment action, "an employee must show a serious and material change in the terms, conditions, or privileges of employment … as viewed by a reasonable person in the circumstances." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001), *overruled on other grounds by Burlington Northern v. White*, 548 U.S. 53 (2006). Moreover, the "asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id*.

**III**

We conclude that the district court did not err in granting summary judgment to the SSA, as Mrs. Porterfield failed to establish a *prima facie* case of disability discrimination. On the adverse employment action claim, Mrs. Porterfield's June 2014 counseling session was not an adverse employment action. Her lower performance evaluation score, however, was an adverse employment action because she received a lower bonus as a result. Nevertheless, the claim falls because Mrs. Porterfield failed to demonstrate that the adverse employment action was taken solely due to her disability. We hold that Mrs. Porterfield's failure to accommodate claim fails. Every time she requested leave due to her migraines as an accommodation, the SSA approved the request, and thus the SSA never failed to accommodate her. We discuss each of the claims separately.

**A**

Mrs. Porterfield asserts two potential adverse employment actions: her counseling session with Mr. Green and the decreased PACS performance rating. In order to establish an adverse employment action, "an employee must show a serious and material change in the terms, conditions, or privileges of employment … as viewed by a reasonable person in the circumstances." *Davis*, 245 F.3d at 1239. After the counseling session, Mrs. Porterfield retained the same job, duties, hours, pay

13

rate, benefits, and ability to apply for promotions. *See* Porterfield Dep. at 79-82, 85. The only detectable change was that, as a result of her LWOP balance, her first line manager was unable to approve further LWOP and she had to request such leave from a different supervisor. We agree with the district court that simply having to request leave from a different supervisor cannot be characterized as a material job consequence, particularly considering Mrs. Porterfield's testimony that all subsequently requested leave was approved.

The same cannot be said, however, of her lowered performance evaluation score. The lowered performance evaluation score was a materially adverse employment action because it lowered her bonus. *See Crawford v. Carrol*, 529 F.3d 961, 974 (11th Cir. 2008) (holding an employee suffered an adverse employment action when she received an unfavorable performance review that affected her eligibility for a merit pay increase). Mrs. Porterfield failed, however, to demonstrate a genuine issue of material fact as to whether the adverse employment action was taken "solely by reason of" her disabilities. *See* 29 U.S.C. § 794(a). Even assuming that Mrs. Porterfield was able to establish facts indicating that the adverse employment action taken was based to some degree on her disability, such a finding is insufficient to satisfy the "solely by reason of" requirement. *See Ellis* 432 F.3d at 1326 (finding it was "not enough for a plaintiff to demonstrate that an adverse employment action was based partly on his disability."). There is some evidence that

14

the adverse employment action was based on her disability, such as Mr. Green's comment to the EEOC, shifting justifications, and conflicts with SSA policy. But Mrs. Porterfield had also accrued hundreds of hours of annual leave, sick leave, advanced annual leave, advanced sick leave, and LWOP. The record indicates that she took leave for various different reasons—vacation leave, leave related to her workers' compensation, FMLA leave for her daughter's asthma, and leave related to her migraines. Ultimately, the evidence offered amounts to no more than a scintilla that the rating decrease was due *solely* to her disability. As a result, Mrs. Porterfield failed to establish a *prima facie* claim of disability discrimination. The district court, therefore did not err in granting summary judgement to the SSA.

Mrs. Porterfield asserts that the SSA failed to provide her with reasonable accommodation by not providing her leave required for her migraines. In the context of a failure to accommodate claim, "a qualified individual is discriminated against when his employer fails to reasonably accommodate his disability." *See D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1236 (11th Cir. 2005). "[A]n employer's failure to reasonably accommodate a disabled individual itself constitutes discrimination under the [Rehabilitation Act], so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007).

15

A reasonable accommodation is one that would allow the employee to perform the essential functions of the job. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). But, "a plaintiff cannot establish a claim under the Rehabilitation Act alleging that the defendant discriminated against [her] by failing to provide a reasonable accommodation unless [she] demanded such an accommodation." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1364 (11th Cir. 1999) (citing *Wood v. President and Trustees of Spring Hill College in the City of Mobile*, 978 F.2d 1214, 1222 (11th Cir. 1992)). Notably, we have yet to determine "precisely what form the request [for a reasonable accommodation] must take." *Holly*, 492 F.3d at 1261 n. 14. Still, "a plaintiff can be said to have made a request for accommodation when the defendant has enough information to know of both the disability and desire for an accommodation." *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1226 (11th Cir. 2016). Mrs. Porterfield provided the SSA with a note from her doctor (updated every six months) which she argues should have allowed her to be absent for her migraines as much as needed, based on the SSA's policy of allowing an unlimited amount of leave without pay as long as it was not for an inappropriate purpose. But indefinite leave is not reasonable as an accommodation because "[n]othing in the text of the reasonable accommodation provision requires an employer to wait for an indefinite period for an

16

accommodation to achieve its intended effect." *Wood v. Green*, 323 F.3d 1309, 1313 (11th Cir. 2003).

We need not address the district court's determination that Mrs. Porterfield's request for unlimited intermittent leave was akin to a request for indefinite leave that is unreasonable as a matter of law. Nor do we need to decide if the documentation provided amounted to a request for a reasonable accommodation. Mrs. Porterfield's claim ultimately fails for the simple reason that a claim for a failure to accommodate necessarily presupposes a failure, on the part of the SSA, to accommodate. Even assuming that her documentation was a request for a reasonable accommodation, and that she did not ask for indefinite leave, Mrs. Porterfield testified that she was never denied any leave when she requested it. Every time she asked for leave due to her migraines the SSA approved the request and so it never failed to accommodate. Thus, there is no genuine issue of material fact, and the district court did not err in granting summary judgment on this claim to the SSA.

## IV

The district court did not err in granting summary judgment to the SSA on Mrs. Porterfield's claims under the Rehabilitation Act.

**AFFIRMED.**